IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

**STATE OF TENNESSEE v. JIMMIE C. SPRATT**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-05068   W. Fred Axley, Judge**

**No. W1999-00611-CCA-R3-CD - Decided June 8, 2000**

Defendant Jimmie C. Spratt was convicted of aggravated rape by a jury in the Shelby County Criminal Court. Defendant was subsequently sentenced to a term of twenty-five years in the Tennessee Department of Correction. Defendant challenges his conviction and his sentence, raising the following issues: (1) whether the trial court erred when it ruled that he improperly struck potential jurors based on the jurors' race; (2) whether the trial court should have dismissed the charges against him because there was an unnecessarily long delay between his arrest and his appearance before a magistrate; (3) whether the trial court erred when it refused to suppress a pretrial statement that he gave to police; (4) whether the trial court erred when it refused to suppress evidence that he had been identified by the victim during a physical lineup; (5) whether the trial court erred when it admitted an out of court statement by the victim into evidence; (6) whether the trial court erred when it admitted evidence about the results of a DNA probability test; (7) whether the trial court erred when it allowed the State to call a rebuttal witness; (8) whether the evidence was sufficient to support his conviction; (9) whether the trial court erred when it failed to instruct the jury on the potential range of punishment; and (10) whether the trial court imposed an excessive sentence. After a review of the record, we reverse the judgment of the trial court and we remand this matter for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**

WOODALL, J., delivered the opinion of the court, in which WADE, P. J. and WITT, J. joined.

A.C. Wharton, Jr. and M. Dell Stiner, Memphis, Tennessee, for the appellant, Jimmie C. Spratt. Paul G. Summers, Attorney General and Reporter, R. Stephen Jobe, Assistant Attorney General, William L. Gibbons, District Attorney General, James Challen, Assistant District Attorney General, and Rosemary Andrews, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# I. FACTS

S.W. (the victim will be referred to by her initials) testified that she was working for the Multiple Sclerosis Society on the morning of December 26, 1996. S.W. arrived for work at approximately 8:00 a.m, and she was the only person in the office. Shortly after she arrived, S.W. heard the door chime indicate that someone had come in the door. When S.W. went to the reception area, she saw Defendant and noticed that he was wearing dark pants and a dark jacket with a large hood and some kind of logo on the back. Defendant asked S.W. what kind of establishment he was in and he asked whether the business had any medication. These questions made S.W. nervous because she believed that they were inappropriate.

S.W. testified that Defendant also asked whether there was a Dr. McGraw in the office complex. S.W. stated that she did not know Dr. McGraw and she opened the telephone book to look up the name. At this point, the victim "blacked out" and she knew that she had been hit. The victim lost consciousness, and when she awoke she could sense that she was being dragged around the office by her hair. While the victim was drifting in and out of consciousness, Defendant asked her where the money was kept.

S.W. testified that Defendant subsequently took her to an area of the office where there were no windows. Defendant then penetrated the victim's vagina with his finger and then with his penis. The victim attempted to resist, but she could not fend off the attack. The victim lost consciousness at this point, and when she awoke she observed that she was alone. S.W. was unable to stand after the attack, so she crawled to her desk and called the police on the telephone. The victim observed that there was a broken beer bottle on her desk and she also noticed that her keys and credit card were missing.

S.W. testified that she was subsequently taken to one medical facility, but she was transferred to another medical facility because she had previously had a kidney and pancreas transplant. S.W. stated that after the attack, she had a cut on her head, slivers of glass in her head, scratches on her neck, and two black eyes.

S.W. testified that she was initially unable to identify her attacker when she viewed a photographic lineup and a physical lineup a short time after the attack. However, when the victim subsequently attended a preliminary hearing and saw Defendant in a group of several people who were all wearing the same clothes, she immediately recognized that Defendant was her attacker.

Sergeant K.C. Mansel testified that he responded to the call from the victim's place of employment and he arrived at 10:04 a.m. Mansel observed that the victim was injured and the victim told him that she had been raped by an African-American male with gold teeth who was wearing dark clothing. Mansel also observed that there was a broken beer bottle on the desk.

Officer Amos Corbitt testified that he lifted fingerprints from the broken beer bottle that was on the desk as well as other objects at the crime scene. Latent fingerprint examiner James Holder testified that he had compared the prints found at the crime scene with prints of Defendant that were

already on file. Holder opined that the prints at the scene and the prints on file were made by the same person.

Sherica Hymes testified that on December 26, 1996, she was working at the same office park where S.W. was working. When Hymes walked out of the bathroom that morning, she literally bumped into Defendant. When Hymes asked Defendant whether she could help him, he made no reply. When Hymes repeated her question, Defendant asked whether a certain law firm was located in the complex. Hymes responded that she had not heard of the law firm, and she directed Defendant toward the office park directory. At this point, the phone rang, the toilet flushed, and Defendant ran out the door.

Hymes testified that on January 8, 1997, she identified Defendant's photograph from a photographic lineup. Hymes also testified that when she observed Defendant on December 26, 1996, he was wearing black pants and a black and red jacket with a hood and a "Bulls" logo on the back.

Dr. Margaret Aiken testified that while she was working for the Memphis Sexual Assault Resource Center on December 26, 1996, she examined S.W. for injuries and for collection of specimens. Dr. Aiken also testified that during the examination, the victim made the following statement: "[S]tated she was at work. States an unknown black male entered her office and requested some information, struck her on the head with a beer bottle, and forced her to have vaginal sex. And that she denied oral or anal acts."

Dr. Aiken testified that during the examination, she observed that S.W. had a scratch on her neck and an abrasion and swelling on top of her head, but she did not have any genital injuries. Dr. Aiken also collected a "rape kit" including blood, vaginal swabs, pubic hair combing, pubic hair lifter, and pubic hair standard.

Special Agent Forensic Scientist Constance Howard testified that she conducted a comparison of the DNA contained in sperm from one of the victim's vaginal swabs with the DNA contained in a blood sample from Defendant. Howard explained the methods that were used to produce an "autorad," or x-ray picture of the DNA samples. Howard was able to visually match the DNA from the vaginal swab with the DNA from Defendant's blood by viewing the autorads. In particular, Howard found that four out of the five DNA probes were a match and one probe was inconclusive.

Howard testified that she fed the autorad results into a computer which had access to a DNA database from the FBI. The results of the statistical analysis performed by the computer indicated that the chance of another individual from the African-American population having the same DNA profile was one in twenty-six million. Howard also stated that the probability for the Caucasian population was one in two hundred million.

Dr. Linda Adkison testified for the defense that Howard had failed to follow proper laboratory procedures in that she had failed to take complete notes as documentation of what she had done during her analysis. Dr. Adkison testified that in her opinion, one of the DNA probes was a

match, two were inconclusive, and two were inconclusive or even non-matches.

Kathy Parks testified by deposition that she lived with Defendant and Douglas Spratt in the McKellar Woods Apartments from August of 1996 to January of 1997. Parks recalled that on December 26, 1996, she slept late. Parks got up to use the bathroom as it was becoming light, and she noticed that Defendant was still in bed. Parks then went back to sleep and she awoke around noon when Defendant came in the bedroom and asked whether she was going to sleep all day. Parks could not remember hearing anyone leave the apartment while she was in bed.

Douglas Spratt, Defendant's uncle, testified that he lived in the McKellar Woods Apartments with Defendant and Parks from July of 1996 to February of 1997. Spratt recalled that when he awoke at 9:00 a.m. on December 26, 1996, he saw Defendant in one of the rooms. Spratt then watched television for several hours and he never saw Defendant go through the one door that was the exit of the apartment. Spratt denied that he went to work on December 26, 1996.

Sharon Wells testified in rebuttal that the records for McAuley's Incorporated showed that Douglas Spratt worked from 6:35 to 10:02 a.m. on December 26, 1996.

## II. STRIKING OF POTENTIAL JURORS

Defendant contends that the trial court erred when it ruled that he could not peremptorily strike two prospective jurors. Specifically, Defendant contends that the trial court improperly concluded that he could not strike these jurors because he was seeking to strike the jurors based solely on their race.

The record indicates that during the first round of challenges during voir dire, Defendant (African-American male) exercised peremptory challenges against prospective jurors Santana (Hispanic male), Giffin (Caucasian female), Pannell (Caucasian male), Archer (Caucasian male), and Hooper (Caucasian male). The State then objected, arguing that the challenges were improper because they were based solely on the jurors' race. Defense counsel denied that the challenges were based on race.

Defense counsel stated that he had challenged Santana because evidence about the collection and transportation of blood samples would be introduced during the trial and Santana's experience working for a company that produced blood products could affect his impartiality. Defense counsel also stated that he had challenged Giffin because her sister had been the victim of a sex offense. In addition, defense counsel stated that he had challenged Archer because he had refused to look at Defendant when asked to do so. Further, defense counsel stated that he had challenged Hooper because his sister's friend had been the victim of a sex offense and because he had been reluctant to ride in the same elevator with defense counsel after lunch. Finally, defense counsel stated that he had challenged Pannell because his wife's sister had been the victim of a sex offense and because he appeared to be frowning at defense counsel at one point.

The trial court ruled that the challenges to Santana and Giffin were based on reasons other

than race and those two prospective jurors were excused. However, the trial court ruled that the challenges to Archer, Pannell, and Hooper were based solely on race and the court reseated them in the jury panel. Archer was subsequently excused for cause, but Pannell and Hooper were members of the jury that convicted Defendant of aggravated rape.

Because Archer was removed for cause before the trial began, Defendant only challenges the trial court's reseating of Pannell and Hooper after Defendant's exercise of peremptory challenges.

In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." Id., 476 U.S. at 89, S.Ct. at 1718. In Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Supreme Court extended this rule to prohibit defendants from striking jurors on the basis of their race. Id., 505 U.S. at 59, 112 S.Ct at 2359. Thus, the State may make a "reverse Batson objection." State v. James E. Hathaway, No. 02C01-9702-CR-00082, 1997 WL 793505, at *6 (Tenn. Crim. App., Jackson, Dec. 30, 1997), app. denied, (Tenn. Oct. 12, 1998).

To invoke the protections of Batson and its progeny, the State must establish a prima facie case that a juror is being challenged on the basis of race. Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770-71, 131 L.Ed.2d 834 (1995); Batson, 476 U.S. at 93-94, 106 S.Ct. at 1721. Once the State has presented a prima facie case, the trial court shall require the defendant to give a race-neutral reason for the challenge. Purkett, 514 U.S. at 767, 115 S.Ct. at 1770-71; McCollum, 505 U.S. at 59, 112 S.Ct. at 2359. "The race or gender neutral explanation need not be persuasive, or even plausible. . . . Unless a discriminatory intent is inherent in the [proponent's] explanation, the reason offered will be deemed race neutral." Purkett, 514 U.S. at 767, 115 S.Ct. at 1770-71. If a race or gender neutral explanation is given, the court must then determine, given all the circumstances, whether the State has established purposeful discrimination. Purkett, 514 U.S. at 767, 115 S.Ct. at 1770-71; Batson, 476 U.S. at 96-98, 106 S.Ct. at 1723-24.

"The trial judge must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination." Woodson v. Porter Brown Limestone Co., Inc., 916 S.W.2d 896, 906 (Tenn. 1996). "The trial court's factual findings are imperative in this context." Id. "On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous." Id. (citation omitted). "Thus, specificity in the findings is crucial." Id. In this case, the trial court's findings in regard to this issue were anything but specific. In fact, the trial court's findings are largely unsupported by reference to anything in the record and rather, the findings generally contain only conclusory statements.

First, the trial court apparently found that a prima facie case of discrimination had been established under part one of the Batson test because the African-American Defendant had challenged four Caucasian and one Hispanic prospective jurors. We conclude that the trial court properly applied part one of the Batson test in finding that this was sufficient to establish a prima facie case of discrimination. In fact, Defendant concedes that there was a prima facie case of

discrimination.

The trial court erred in its application of parts two and three of the <u>Batson</u> test. As previously stated, the trial court's findings are anything but specific, and it is not entirely clear what method the trial court used to arrive at its ultimate finding on this issue. However, it appears that what happened in this case is that once the State satisfied part one of the <u>Batson</u> test by raising a prima facie case of discrimination, the trial court erroneously combined parts two and three and placed the burden on Defendant both to propose race-neutral reasons for the challenges and then prove that the race-neutral reasons where in fact the actual reasons. This was improper. As the United States Supreme Court has explained, "the ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike." <u>Purkett</u>, 514 U.S. at 768, 115 S.Ct. 1769. <u>See also</u> <u>Unites States v. McFerron</u>, 163 F.3d 952, 955 (6th Cir. 1998). It is absolutely clear that after the State satisfied part one of the <u>Batson</u> test, Defendant satisfied part two by offering race-neutral reasons for the challenges. At this point, the trial court should have applied part three of the test by determining whether, under the totality of the circumstances, the State had met its burden of showing that the race-neutral reasons offered by Defendant were only a pretext for purposeful discrimination. Instead, the trial court never engaged in the type of analysis required by part three.

We conclude that under the totality of the circumstances, the State failed to establish purposeful discrimination for the challenges to Pannell and Hooper. Initially, we note that the trial court found that prospective jurors Santana and Giffin were properly challenged for race-neutral reasons. Thus, at most, only three of the peremptory challenges (for Archer, Pannell, and Hooper) were even possibly based on race. In addition, neither party has referred to anything in the record and we have been unable to find anything that identifies the races of the other remaining prospective jurors who were not challenged by Defendant. The record indicates that at the time of the first round of peremptory challenges, there were thirteen prospective jurors who were not challenged by Defendant. The record is silent as to the races of these unchallenged jurors and thus, we do not know whether all, some, or none of them were Caucasian. Without knowing how many of the unchallenged prospective jurors were the same race as Pannell, Hooper, and Archer, we are able to place little significance on the fact that these three individuals were all of the same race. Indeed, the trial court's complete failure to refer to the races of the unchallenged prospective jurors indicates that this factor played no part in the court's determination. Thus, we must assume that no discriminatory purpose can be inferred by comparing the races of the challenged and unchallenged prospective jurors.

In addition, Defendant offered valid race neutral reasons for challenging Pannell and Hooper. Pannell stated during voir dire that his wife's niece had been a victim of a sex offense, Hooper stated that his sister's friend had been the victim of a sex offense, and defense counsel told the trial court that he had challenged these prospective jurors because of their acquaintance with victims of sex offenses. Indeed, <u>these reasons are fairly similar to reasons this Court has held indicated that the State's use of peremptory challenges was not based on racial discrimination</u>. <u>See, e.g.</u>, <u>State v. Corey Lemont Powell</u>, No. 02C01-9707-CC-00265, 1999 WL 512072, at *9 (Tenn. Crim. App., Jackson, July 21, 1999), <u>app. denied</u>, (Tenn. Jan. 24, 2000) (prospective juror had two family members who had been convicted of felony offenses); <u>State v. Marcus Anthony Robinson</u>, No.

03C01-9512-CR-00410, 1997 WL 396241, at \*2 (Tenn. Crim. App., Knoxville, July 16, 1997) (prospective juror was familiar with the area where the crime occurred and his close friend had been murdered three weeks before trial); State v. James Anthony "King" Brown, No. 03C01-9409-CR-00350, 1995 WL 442598, at \*4 (Tenn. Crim. App., Knoxville, July 25, 1995) (prospective juror was the mother of a known drug dealer). Yet when the trial court stated that it found that Pannell and Hooper were challenged solely for racial reasons, the trial court made absolutely no mention of their association with victims of sex offenses and their possible lack of impartiality. Thus, it appears that when the trial court made its finding of discrimination, the trial court did not even consider Defendant's claim that Pannell and Hooper were being challenged because their association with sex offense victims might affect their impartiality. Indeed, the trial court failed to even mention this claim when it made its conclusory ruling. Instead, it appears that the trial court based its finding of discrimination solely on the fact that Defendant had challenged three Caucasian males.

"The peremptory challenge is one of the oldest established rights of the criminal defendant." United States v. Annigoni, 96 F.3d 1132, 1136 (9th Cir. 1996). For more than one hundred years, the United States Supreme Court has recognized that peremptory challenges are "an essential part of the trial." Lewis v. United States, 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892). The Supreme Court has also stated that the right of peremptory challenge is "one of the most important of the rights secured to the accused." Pointer v. United States, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894). The importance of the right to make peremptory challenges is demonstrated by the extraordinary remedy courts have traditionally afforded to an accused who was deprived of the right: reversal of conviction, without a showing of prejudice. Lewis, 146 U.S. at 376, 13 S.Ct. at 138.

"Peremptory challenges, along with challenges for 'cause,' are the principal tools that enable litigants to remove unfavorable jurors during the jury selection process." Annigoni, 96 F.3d at 1137. "The central function of the right of peremptory challenge is to enable a litigant to remove a certain number of potential jurors who are not challengeable for cause, but in whom the litigant perceives bias or hostility." Id. "The function of the [peremptory] challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise." Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965), overruled on other grounds, Batson, 476 U.S. 79, 106 S.Ct. 1712.

In this case, Defendant sought to exercise peremptory challenges against Pannell and Hooper for the very reason that such challenges exist—to remove prospective jurors who are perceived to be unfavorable because of possible bias or hostility. When a defendant is wrongly deprived of peremptory challenges because of a trial court's erroneous application of the Batson test, the remedy is a reversal of the conviction and a remand for a new trial. McFerron, 163 F.3d at 955-56. Therefore, we reverse Defendant's conviction and we remand this matter for a new trial. Reversal and remand are required pursuant to Rule 36(b) of the Tennessee Rules of Appellate Procedure in order to prevent prejudice to the judicial process. This result is necessary even though Defendant is not entitled to relief on the other issues, including the legal sufficiency of the evidence. However, in the event of further appeal, and to provide guidance for the trial court on remand, we will address

all of the issues raised by Defendant to the extent that they are not waived.

### III.  DELAY BETWEEN ARREST AND APPEARANCE BEFORE MAGISTRATE

Defendant contends that the trial court should have dismissed the charges against him because there was an unnecessary delay between his arrest and his appearance before a magistrate.

Initially we note that Defendant has waived this issue by failing to include it in his motion for a new trial.  Tenn. R. App. P. 3(e); State v. Maddox, 957 S.W.2d 547, 553 (Tenn. Crim. App. 1997).  Notwithstanding waiver, Defendant is not entitled to relief on the merits.

Defendant contends that under Rule 5(a) of the Tennessee Rules of Criminal Procedure, the trial court should have dismissed the charges against him because there was an unnecessarily long delay of eight days between the time that he was arrested and the time that he was taken before a magistrate.  Rule 5(a) provides, in relevant part:

> Any person arrested except upon a capias pursuant to an indictment or presentment shall be taken without unnecessary delay before the nearest appropriate magistrate of the county from which the warrant for arrest issued, or the county in which the alleged offense occurred if the arrest was made without a warrant unless a citation is issued pursuant to Rule 3.5.

Tenn. R. Crim. P. 5(a).

Contrary to Defendant's assertion, absolutely nothing in Rule 5(a) provides that if there is an unnecessary delay between arrest and appearance before a magistrate, the charges against the accused must be dismissed.  Moreover, Defendant has cited no authority in support of his unique proposition.  In fact, this Court has previously rejected the argument that an indictment must be dismissed when  there is an unnecessary delay between arrest and appearance before a magistrate. See State v. David Keith Kearney, No. M1998-0037-CCA-R3-CD, 1999 WL 1103496, at *5 (Tenn. Crim. App., Nashville, Dec. 7, 1999) (No Rule 11 filed).

The real thrust of Defendant's argument for this issue appears to be a claim that evidence obtained as a result of the unnecessary delay should have been suppressed.  In support of this argument, Defendant cites State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996), in which the Tennessee Supreme Court held that under certain circumstances, a confession obtained during an unnecessary delay must be suppressed.  We need not decide whether the Huddleston test would have required the suppression of the evidence Defendant complains about because a review of the record indicates that the evidence was never introduced during trial.

Defendant's major complaint is that a pretrial statement he gave to police should have been suppressed under Huddleston because he made the statement during the delay between his arrest and his appearance before a magistrate.  However, we have carefully reviewed the record and we note that this pretrial statement was never introduced into evidence during trial.  Whether or not the statement should have been suppressed is irrelevant because it was not introduced during trial.

Although it is not entirely clear, it appears that Defendant also contends that the trial court

-8-

should not have allowed the State to introduce evidence that S.W. identified him during a physical lineup that occurred during the delay between his arrest and his appearance before a magistrate. This contention is inaccurate. The State did not introduce any evidence that S.W. identified Defendant during the physical lineup. Indeed, S.W. specifically testified that she was unable to identify anyone during the physical lineup. Thus, Defendant has nothing to complain about in regard to this issue.

In short, Defendant was not entitled to a dismissal of the charges against him because of the delay between arrest and the appearance before a magistrate. In addition, the evidence that Defendant contends should have been suppressed was never introduced during trial and thus, he has nothing to complain about concerning this issue.

## IV. ADMISSIBILITY OF DEFENDANT'S PRETRIAL STATEMENT

Defendant contends that the trial court erred when it refused to suppress a pretrial statement that he gave to police. Specifically, Defendant contends that the statement was inadmissible under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Initially we note that Defendant has waived this issue by failing to include it in his motion for a new trial. Tenn. R. App. P. 3(e); Maddox, 957 S.W.2d at 553. Moreover, as previously mentioned, the record indicates that the pretrial statement that Defendant complains about was never introduced into evidence during trial. Thus, whether the statement was admissible under Miranda is completely irrelevant.

## V. ADMISSIBILITY OF LINEUP IDENTIFICATION

Defendant contends that the trial court erred when it refused to suppress evidence that the victim had identified him during a physical lineup. Specifically, Defendant contends that the evidence of identification should have been suppressed because it was the result of impermissibly suggestive procedures.

Initially we note that Defendant has waived this issue by failing to include it in his motion for a new trial. Tenn. R. App. P. 3(e); Maddox, 957 S.W.2d at 553. Moreover, as previously mentioned, Defendant's argument is inaccurate. The State never introduced evidence that the victim identified Defendant during the physical lineup. Rather, S.W. specifically testified that she was unable to identify anyone during the physical lineup. Thus, whether an identification made at the lineup should have been suppressed is simply not relevant.

## VI. ADMISSION OF THE VICTIM'S OUT OF COURT STATEMENT

Defendant contends that the trial court erred when it allowed Dr. Aiken to testify that during the examination, S.W. made the following statement: "[S]tated she was at work. States an unknown black male entered her office and requested some information, struck her on the head with a beer bottle, and forced her to have vaginal sex. And that she denied oral or anal acts." Specifically, Defendant contends that this out of court statement was inadmissible hearsay.

Initially, we note that "[i]t is well established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of discretion." State v. Stinnett, 958 S.W.2d 329, 331 (Tenn. 1997).

Out of court statements are generally not admissible because they are considered to be hearsay. See Tenn. R. Evid. 801, 802. However, Rule 803(4) contains an exception to the rule against the admission of hearsay. Rule 803 (4) provides:

Statements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment.

Tenn. R. Evid. 803(4). "The rationale justifying the exception is two-fold: (1) a statement made by a patient to a physician is presumptively trustworthy because a patient is strongly motivated to speak the truth in order to receive proper diagnosis and treatment; and (2) any statement upon which a physician will rely as a basis for diagnosis and treatment is also sufficiently reliable for consideration by a court of law." Stinnett, 958 S.W.2d at 331.

Defendant first contends that S.W.'s statement was not admissible under Rule 803(4) because the trial court failed to hold a jury out hearing as required by State v. McLeod, 937 S.W.2d 867 (Tenn. 1996). In McLeod, the Tennessee Supreme Court held that "in order to determine the admissibility under Rule 803(4) of a statement made by a child-declarant, the trial court shall conduct an evidentiary hearing outside the jury's presence." Id. at 869. It is not entirely clear whether McLeod's requirement of a jury out hearing to determine admissibility under Rule 803(4) also applies in cases where the statement is made by an adult-declarant. However, the trial court did hold a jury out hearing to determine admissibility of S.W.'s statement. While no witness testimony was presented during the hearing, it is apparent that there was no misunderstanding between the parties about the content of the statement and the circumstances under which it was given.

Defendant also contends that the victim's statement was not admissible under Rule 803(4) because it was not given for the purpose of "diagnosis and treatment." Specifically, Defendant places great emphasis on testimony from Dr. Aiken that she did not treat and did not intend to provide treatment for S.W. However, this Court has previously held that even when statements are made to someone who will not provide treatment, the statement is still admissible under Rule 803(4), "provided that such statements are for the purpose of diagnosis and treatment of a medical or physical problem." State v. Williams, 920 S.W.2d 247, 256 (Tenn. Crim. App. 1995).

We conclude that the portions of S.W.'s statement indicating that she was struck on the head with a beer bottle and was then raped vaginally, rather than orally or anally, were "reasonably pertinent to diagnosis and treatment" as required for admissibility under Rule 803(4). Although Dr. Aiken did testify that she did not treat victims herself, she also testified that the purpose of her examinations is to "assess people who allege sexual assault, sexual abuse, for injury." In addition, S.W.'s identification of the cause of her injuries led Dr. Aiken to examine her head and observe the abrasion and swelling on top of the head. The identification of the cause of the injuries also led Dr. Aiken to examine S.W.'s genital area and determine that there were no genital injuries. As noted by the Tennessee Supreme Court:

The rationale underlying the hearsay exception for statements made for purposes of medical diagnosis and treatment is that the declarant's motive of obtaining improved health increases the statements's reliability and trustworthiness. This motivation is considered stronger than the motivation to lie or shade the truth. Patients generally go to doctors to receive treatment, and treatment usually depends, in part, on what is said; thus the declarant has a self-interested motive to tell the truth.

State v. Gordon, 952 S.W.2d 817, 822 (Tenn. 1997). The circumstances of this case support an inference that S.W.'s motivation for telling Dr. Aiken that she had been struck on the head with a beer bottle and then vaginally raped was for the purpose of medical diagnosis and treatment. Thus, these portions of the statement were properly admitted.

On the other hand, we conclude that the portions of S.W.'s statement indicating that she was attacked at work by a black man who had requested information were not "reasonably pertinent to diagnosis and treatment." Indeed, this Court has previously held that in cases involving an adult victim of a rape, extraneous facts such as a description of the assailant and a description of events before the rape are not admissible under Rule 803(4), and those facts should be redacted from the admissible part of the statement. Williams, 920 S.W.2d at 256-57. Thus, the trial court erred when it admitted the portions of S.W.'s statement indicating that she was attacked at work by a black man who had requested information. However, this error was clearly harmless. These portions of the statement were merely cumulative of the victim's testimony at trial. Further, Dr. Aiken's testimony about the statement was essentially identical to the testimony of Sergeant Mansel that was introduced without any objection from Defendant—that S.W. told him that she had been raped by an African-American male with gold teeth who was wearing dark clothing. Therefore, admission of these portions of the statement was harmless. See Tenn. R. Crim. P. 52(a).

## VII.  ADMISSION OF DNA PROBABILITY EVIDENCE

Defendant contends that the trial court erred when it allowed Howard to testify about the statistical probabilities for the DNA evidence obtained in this case. Defendant does not challenge the admission of Howard's testimony that she found that four out of the five DNA probes were a visual match.

Howard testified that she had been employed with the Tennessee Bureau of Investigation as a Special Agent Forensic Scientist for twelve and one half years. In addition to receiving Bachelors of Science and Masters of Science degrees, Howard had also attended "the basic serology class, the DNA typing and methods course, and the advanced DNA typing and methods course, all held at the FBI academy in Quantico, Virginia." Howard had also performed the RFLP (restriction fragment length polymorphism) type of DNA analysis in approximately 150 criminal cases, and she had testified as an expert witness on DNA analysis eighteen times in the State of Tennessee. The trial court declared Howard to be an expert witness without objection from Defendant.

Howard testified about the manner in which she created swatches from the blood sample of Defendant and the vaginal swab taken from S.W. Howard placed the swatches in a chemical that caused the cells to release the DNA into the solution. Howard subsequently added additional

chemicals to cut the DNA in various lengths. Howard then exposed the DNA to radioactive probes to create autorads. Howard was able to visually match the DNA from the vaginal swab with the DNA from Defendant's blood by viewing the autorads, and she found that four out of the five DNA probes were a match and one probe was inconclusive. There was no objection to this testimony.

Howard testified that the autorad results were entered into a computer which translated the results into band sizes that can be used by another computer program which compares the band sizes from the samples with those of the general population to determine the percentage of the population that would have the same DNA pattern as the samples. At this point, Defendant objected to any testimony about the results of the statistical analysis performed by the computer.

Howard testified in a jury out hearing that the statistical analysis performed by the computer uses a database developed by the Federal Bureau of Investigation. The FBI database has been "subject to peer review and published in the different journals." The database was originally created from samples taken from recruits from all over the country and it was subsequently expanded.

Howard testified that the computer program compares the band sizes of the sample to those of the general population to determine how often the band sizes of the sample occur in the general population. The computer program performs this analysis by using the "product rule" by multiplying the individual probe probabilities together to arrive at the probability for the entire set of matches together in the general population.

At this point, Defendant renewed his objection to any testimony about DNA probabilities, contending that there was no assurance that the DNA probability analysis was valid or that Howard was qualified to testify about it. The trial court overruled the objection, and Howard testified that according to the analysis, the chance of another individual from the African-American population having the same DNA profile was one in twenty-six million. Howard also stated that the probability for the Caucasian population was one in two hundred million.

The admission of expert testimony regarding scientific and technical evidence is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. Rule 702 provides:
> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. In addition, Rule 703 provides:
> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid 703. "Questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court, whose ruling will not be

overturned in the absence of abuse or arbitrary exercise of discretion." State v. Begley, 956 S.W.2d 471, 475 (Tenn. 1997).

The Tennessee Supreme Court has promulgated specific principles to guide a trial court in the determination of whether to admit scientific or technical evidence:

> First, the evidence must be relevant to a fact at issue in the case. Tenn. R. Evid. 401, 402. Second, the expert must be qualified by specialized knowledge, skill, experience, training, or education in the field of expertise, and the testimony in question must substantially assist the trier of fact to understand the evidence or determine a fact in issue. Tenn. R. Evid. 702; McDaniel[ v. CSX Transportation, Inc., 955 S.W.2d 257, 264 (Tenn. 1997)]; see also Otis v. Cambridge Mutual Fire Ins. Co., 850 S.W.2d 439, 443 (Tenn. 1992). Finally, when the expert witness offers an opinion or states an inference, the underlying facts or data upon which the expert relied must be trustworthy. Tenn. R. Evid. 703; McDaniel, [955 S.W.2d] at 264.

Begley, 956 S.W.2d at 475.

The first question under the Begley test is whether the results of the RFLP method of DNA analysis are relevant under Rule 401 of the Tennessee Rules of Evidence. We conclude that the results are relevant. The only element of the aggravated rape offense that was in dispute was the identity of S.W.'s assailant. Evidence that the DNA discovered in the vaginal swab of S.W. was consistent with Defendant's DNA and that there was only a one in twenty-six million chance that the DNA came from another individual in the African-American population and only a one in two hundred million chance that the DNA came from an individual in the Caucasian population is clearly relevant because it establishes Defendant's identity as the perpetrator.

The next question under the Begley test is whether Howard is qualified as an expert and whether her testimony would substantially assist the trier of fact in understanding the evidence or determining a fact in issue. We conclude that this part of the test was satisfied. Howard was extensively qualified by her education and experience in the field of the RFLP method of DNA analysis. Contrary to Defendant's assertions, the record indicates that Howard was familiar with the generation of statistical probabilities from DNA evidence. In addition, Howard explained the process and results of the DNA analysis in a way that substantially assisted the jury in understanding the complex evidence.

The final question under the Begley test is whether the facts and data relied upon by Howard in giving her opinion where trustworthy and reliable. We conclude that this part of the test was satisfied. Tennessee Code Annotated section 24-7-117 provides:

> (a) As used in this section, unless the context otherwise requires, "DNA analysis" means the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes.
>
> (b)(1) In any civil or criminal trial, hearing or proceeding, the results of DNA analysis, as defined in subsection (a), are admissible in evidence without antecedent expert testimony that DNA analysis provides a trustworthy and reliable method of identifying

characteristics in an individual's genetic material upon a showing that the offered testimony meets the standards of admissibility set forth in the Tennessee Rules of Evidence.

(2) Nothing in this section shall be construed as prohibiting any party in a civil or criminal trial from offering proof that DNA analysis does not provide a trustworthy and reliable method of identifying characteristics in an individual's genetic material, nor shall it prohibit a party from cross-examining the other party's expert as to the lack of trustworthiness and reliability of such analysis.

(c) In any civil or criminal trial, hearing or proceeding, statistical population frequency evidence, based on genetic or blood test results, is admissible in evidence to demonstrate the fraction of the population that would have the same combination of genetic markers as was found in a specific biological specimen. For purposes of this subsection, "genetic marker" means the various blood types or DNA types that an individual may possess.

Tenn. Code Ann. § 24-7-117 (Supp. 1999). By enacting this statute, "[t]he Legislature has determined that DNA analysis is a trustworthy and reliable method of identifying characteristics in an individual's genetic material and will be admissible so long as it otherwise meets the requirements of the Tennessee Rules of Evidence." Begley, 956 S.W.2d at 476. Because DNA evidence is statutorily regarded as trustworthy and reliable, DNA evidence is exempted from the trial court's determination under Rule 703 of the Tennessee Rules of Evidence of whether it provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material. Id. at 477. "Consequently, a judicial determination of the scientific reliability of the evidence is unnecessary." Id. Moreover, we note that even before section 24-7-117 became effective, this Court had already determined that the RFLP method of DNA analysis was reliable and trustworthy. See State v. Harris, 866 S.W.2d 583, 587 (Tenn Crim. App. 1992).

We also note that Defendant was statutorily entitled to challenge the DNA test results in this case. See Tenn. Code Ann. § 24-7-117(b)(2) (Supp. 1999). Indeed, Defendant did challenge the results by introducing Adkison's testimony that Howard had been sloppy and had failed to follow protocol. However, Defendant's challenge went only to the weight, and not the admissibility, of Howard's testimony. See Begley, 956 S.W.2d at 478.

In short, we conclude that Howard's testimony about the DNA probability test results was admissible under the standards of Begley. Thus, we cannot say that the trial court abused its discretion when it admitted this evidence.

## VIII. REBUTTAL WITNESS

Defendant contends that the trial court erred when it allowed the State to call Wells to rebut the testimony of Douglas Spratt that he was at home rather than at work on the date of the offense. Specifically, Defendant contends that the State should not have been allowed to call Wells in rebuttal because the State failed to give notice of its intent to do so at least ten days before trial as required by Rule 12.1(b) of the Tennessee Rules of Criminal Procedure.

-14-

The record indicates that Defendant made no objection when the State called Wells to testify. By failing to make a contemporaneous objection, Defendant waived this issue. See State v. Robinson, 971 S.W.2d 30 (Tenn. Crim. App. 1997); State v. Gilmore, 823 S.W.2d 566, 570 (Tenn. Crim. App. 1991); Tenn. R. App. P. 36(a). Moreover, Rule 12.1(e) provides that if good cause is shown, the trial court may grant an exception to the notice requirement. See Tenn. R. Crim. P. 12.1(e). Defendant's failure to make a contemporaneous objection prevented the State from having an opportunity to present a reason for not providing notice and prevented the trial court from determining whether the reason was sufficient. Defendant has clearly waived this issue.

## IX. SUFFICIENCY OF THE EVIDENCE

Defendant contends that the evidence was insufficient to support his conviction for aggravated rape.

Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this Court is required to afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App.1995). Since a verdict of guilt removes the presumption of a defendant's innocence and replaces it with a presumption of guilt, the defendant has the burden of proof on the sufficiency of the evidence at the appellate level. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Under Tennessee law, aggravated rape is "unlawful sexual penetration of a victim by the defendant" where "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon." Tenn. Code Ann. § 39-13-502(a)(1) (1997). Defendant essentially concedes that the evidence was sufficient to prove that S.W. was the victim of unlawful and forcible sexual penetration by someone armed with a weapon. Basically, Defendant's only argument in regard to this issue is that the evidence that he was the perpetrator of the aggravated rape was insufficient to support his conviction.

We conclude that when the evidence in this case is viewed in the light most favorable to the State, as it must be, the evidence was sufficient to support Defendant's conviction. S.W. testified that Defendant raped her after hitting her on the head with a beer bottle, and she was unequivocal about her identification of Defendant during trial. In addition, Hymes testified that she saw Defendant in the area of the crime scene at the approximate time that the crime was committed, and she testified that Defendant was wearing clothes nearly identical to the clothes that S.W. testified he was wearing when he attacked her. Further, Defendant's fingerprints were found on the broken

beer bottle that was used to strike the victim in the head. Finally, Howard testified that she was able to visually match the DNA from S.W.'s vaginal swab with the DNA from Defendant's blood by viewing autorads, and the chance of another individual from the African-American population having the same DNA profile was one in twenty-six million and the probability for the Caucasian population was one in two hundred million.

## X. RANGE OF PUNISHMENT INSTRUCTION

In the table of contents of his brief, Defendant contends that the trial court erred when it failed to instruct the jury on range of punishment. However, there is no corresponding section in the argument part of Defendant's brief. Therefore, Defendant has waived this issue by failing to provide any argument, failing to cite to anything in the record, and failing to cite any authority in support of his claim. Tenn. Ct. Crim. App. R. 10(b).

## XI. LENGTH OF SENTENCE

Defendant contends that the trial court imposed an excessive sentence for his conviction.

"When reviewing sentencing issues . . . including the granting or denial of probation and the length of sentence, the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (1997). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider all the evidence, the presentence report, the sentencing principles, the enhancing and mitigating factors, arguments of counsel, the defendant's statements, the nature and character of the offense, and the defendant's potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -210(b) (1997 & Supp. 1999); Ashby, 823 S.W.2d at 169. "The defendant has the burden of demonstrating that the sentence is improper." Id. Because the record in this case indicates that the trial court did not consider the sentencing principles and all relevant facts and circumstances, our review is de novo without a presumption of correctness.

Defendant was convicted of aggravated rape, which is a Class A felony. See Tenn. Code Ann. § 39-13-502(b). The sentence for a Range I offender convicted of a Class A felony is between fifteen and twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1) (1997). The presumptive sentence for a Class A felony is the midpoint of the range if there are no enhancement or mitigating factors. Tenn. Code Ann.§ 40-35-210(c) (1997). If the court finds that enhancement and mitigating factors are applicable, the court must begin with the midpoint and enhance the sentence to appropriately reflect the weight of any statutory enhancement factors and then the court must reduce the sentence to appropriately reflect the weight of any mitigating factors. See State v. Chance, 952 S.W.2d 848, 850–51 (Tenn. Crim. App. 1997).

The record indicates that in imposing a sentence of twenty-five years, the trial court found that the following enhancement factors applied: (4) the victim of the offense was particularly vulnerable because of physical disability; (5) Defendant treated the victim with exceptional cruelty during the commission of the offense; (6) the personal injuries inflicted on the victim were particularly great; (7) the offense involved a victim and was committed to satisfy Defendant's desire for pleasure or excitement; (9) Defendant possessed a deadly weapon during the commission of the offense; (10) Defendant had no hesitation about committing a crime when the risk to human life was high; (12) during the commission of the felony, Defendant willfully inflicted bodily injury on the victim; and (16) the crime was committed under circumstances where the potential for bodily injury to the victim was great. See Tenn. Code Ann. § 40-35-114(4), (5), (6), (7), (9), (10), (12), (16) (1997). The trial court also found that none of the enumerated mitigating factors of Tennessee Code Annotated section 40-35-113 were applicable.

Defendant contends that the trial court erred when it applied enhancement factor (1), that Defendant had a previous record of criminal convictions or behavior in addition to what is required to establish the appropriate sentencing range. See Tenn. Code Ann. § 40-35-114(1) (1997). However, the record indicates that the trial court did not apply factor (1).

Defendant challenges the trial court's application of enhancement factor (4), that the victim of the offense was particularly vulnerable because of physical disability. We conclude that factor (4) was improperly applied. The record indicates that the trial court applied this factor merely because the victim had previously had a kidney and pancreas transplant. However, this Court has previously stated that

> [A] victim is particularly vulnerable within the meaning of this enhancement factor when the victim lacks the ability to resist the commission of the crime due to age, a physical condition, or a mental condition. A victim is also particularly vulnerable when his or her ability to summons assistance is impaired; or the victim does not have the capacity to testify against the perpetrator of the crime. However, a finding that one of these conditions exists does not, as a matter of law, mean that this factor is automatically considered. The appellant must have taken advantage of one or more of these conditions during the commission of the crime. The state had the burden of establishing the limitations that render the victim "particularly vulnerable." The state also had the burden of establishing that the condition which rendered the victim "particularly vulnerable" was a factor in the commission of the offense.

State v. Butler, 900 S.W.2d 305, 313 (Tenn. Crim. App. 1994). In this case, the State failed to meet its burden of demonstrating that the victim was "particularly vulnerable" because of physical disability. There is no proof in the record that S.W.'s status as a transplant recipient affected her ability to resist, her ability to summon help, or her ability to testify against Defendant. Indeed, S.W. did attempt to resist, she was able to summon help shortly after the attack, and she did testify against Defendant at trial. Thus, we conclude that the trial court erred when it applied this factor.

Defendant challenges the application of enhancement factor (5), that Defendant treated the victim with exceptional cruelty during the commission of the offense. We conclude that factor (5) was properly applied. The Tennessee Supreme Court has stated that before this factor may be applied, the facts in the case must "support a finding of 'exceptional cruelty' that 'demonstrates a

culpability distinct from and appreciably greater than that incident to'" the crime. State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997) (citation omitted). See also State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995) (holding that application of enhancement factor (5) "requires a finding of cruelty over and above that inherently attendant to the crime"). We conclude that Defendant's actions of striking the victim on the head with a beer bottle with such force to cause the bottle to shatter and then dragging the victim around the office by her hair represents a culpability distinct from and appreciably greater than that incident to the offense.

Defendant does not specifically challenge the application of enhancement factor (6), that the personal injuries inflicted on the victim were particularly great. However, we conclude that it was improperly applied. The record indicates that the trial court applied this factor based on a finding that the victim had sustained long term physical and emotional injuries as a result of the offense. The finding of long term physical injuries is not supported by the record. The only physical injuries that S.W. testified that she sustained during the attack were cuts on her head, bruises and scratches on her neck, and headaches that lasted for a few weeks. Although the victim received special medical treatment as a precaution due to her status as a transplant recipient, there was no proof that her transplants suffered any actual injuries from the attack. As for the finding of long term emotional injuries, S.W. did testify that she still suffers from fear and stress because of the attack and she has also suffered from depression. "However, before this factor may be applied, the State has the burden of establishing that the emotional injuries and psychological scarring are 'particularly great.'" State v. Quinton Cage, No. 01C01-9605-CC-00179, 1999 WL 30595, at *10 (Tenn. Crim. App., Nashville, Jan. 26, 1999), app. denied, (Tenn. July 12, 1999) (citation omitted). "In order to prove that the injuries are particularly great and/or will endure 'for the rest of [the victim's] life,' the State must offer expert testimony to that effect." Id., 1999 WL 30595, at *10 (citation omitted). We do not doubt that S.W. was traumatized by the aggravated rape. However, because the State failed to introduce any expert testimony that her emotional injuries were particularly great compared to those suffered by every victim of an aggravated rape, application of enhancement factor (6) was not appropriate.

Defendant challenges the application of enhancement factor (7), that the offense involved a victim and was committed to satisfy Defendant's desire for pleasure or excitement. We conclude that factor (7) was improperly applied. The State has the burden of demonstrating that the crime was committed to gratify a defendant's desire for pleasure or excitement. State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). This is because "some acts of rape are not committed for pleasure at all." Id. "Some crimes of this nature are simply acts of brutality resulting from hatred or the desire to seek revenge, control, intimidate, or are the product of a misguided desire to just abuse another human being." Id. In this case, the State failed to introduce any evidence from which it can be inferred that the aggravated rape was committed to gratify Defendant's desire for sexual pleasure or excitement, rather than any number of other reasons such as a desire to intimidate, coerce, or simply abuse the victim. Thus, this factor was improperly applied.

Defendant does not specifically challenge the application of enhancement factor (9), that Defendant possessed a deadly weapon during the commission of the offense. However, we conclude that it was improperly applied. In this case, Defendant was convicted of committing aggravated rape

while in possession of a weapon. This Court has previously held that factor (9) cannot be applied to a sentence for aggravated rape committed with a weapon because the factor is an element of the offense. State v. Baker, 956 S.W.2d 8, 17 (Tenn. Crim. App. 1997). Thus, this factor was improperly applied.

Defendant does not specifically challenge the application of enhancement factor (10), that Defendant had no hesitation about committing a crime when the risk to human life was high. We conclude that it was properly applied. This Court has previously held that factor (10) is not an element of the offense of aggravated rape committed while in possession of a weapon and it may be applied when the use of the weapon involves a greater risk of harm than that required by the standards of the aggravated rape statute. Manning v. State, 883 S.W.2d 635, 640 (Tenn. Crim. App. 1994). Here, Defendant was convicted of aggravated rape while in possession of a weapon. Defendant's conduct of striking the victim on the head with enough force to shatter the bottle involves a greater risk of harm that merely being in possession of the bottle.

Defendant does not challenge the application of enhancement factor (12), that Defendant willfully inflicted bodily injury on a victim during the commission of a felony. We conclude that factor (12) was properly applied. It is undisputed that Defendant willfully injured S.W. when he struck her in the head with a glass beer bottle. The infliction of bodily injury is not an essential element of aggravated rape committed while in possession of a weapon. Therefore, factor (12) was properly applied.

Defendant challenges the application of enhancement factor (16), that the crime was committed under circumstances where the potential for bodily injury to the victim was great. We conclude that this factor was properly applied. This Court has previously stated that

> The General Assembly has seen fit to enhance the punishment for . . . aggravated rape. In doing so, the General Assembly recognized that the potential for bodily injury to the victim is great when th[is] crime[ is] committed. Thus, a trial court should not apply [factor (16)] absent extraordinary circumstances.

State v. Smith, 891 S.W.2d 922, 930 (Tenn. Crim. App. 1994). Defendant's conduct of striking the victim on the head with enough force to shatter the bottle and then dragging the victim around the office by her hair created a greater potential for bodily injury than is inherent in the crime of aggravated rape committed while in possession of a weapon. Thus, there were extraordinary circumstances in this case.

Defendant does not contend that the trial court should have applied any mitigating factors and we conclude that no mitigating factors were applicable.

Finally, Defendant contends that when a trial court misapplies an enhancement factor, as in this case, the proper remedy is a reversal of the conviction and a remand for a new trial. Defendant has cited no authority for this proposition and we reject it.

Even though we hold that the trial court erred in applying four enhancement factors, a finding that enhancement factors were erroneously applied does not equate to a reduction in the sentence.

State v. Keel, 882 S.W.2d 410, 423 (Tenn. Crim. App.1994). We conclude in our de novo review that based on the record before us, the four applicable enhancement factors are entitled to significant weight and a sentence of twenty-five years would be appropriate if the conviction had been affirmed. However, we emphasize that in the event that Defendant is convicted during a new trial, the proof at the new trial and sentencing hearing may support some or all of the enhancement factors that we have concluded were inapplicable based on the record before us. Moreover, the proof may not support some or all of the enhancement factors that we have concluded were applicable and it may or may not support the application of additional enhancement or mitigating factors that were not addressed in this opinion. Regardless, in the event of a new trial and conviction, the trial court must base its sentencing decision based on the proof established at the new trial and sentencing hearing.

## XII. CONCLUSION

In conclusion, we hold that Defendant was wrongly deprived of peremptory challenges because of the trial court's erroneous application of the Batson test. Therefore, we REVERSE Defendant's conviction and we REMAND this matter for a new trial and for further proceedings consistent with this opinion