IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2000 Session

## STATE OF TENNESSEE v. CARL DEAN BOLIN

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 39773     Robert W. Wedemeyer, Judge**

---

**No. M1999-00849-CCA-R3-CD - Filed January 28, 2002**

---

The defendant, Carl Dean Bolin, was convicted by a Montgomery County Circuit Court jury of reckless homicide, a Class D felony. The trial court sentenced the defendant as a Range I, standard offender to four years in the Department of Correction. On appeal, the defendant contends that the trial court erred in sentencing him to the maximum of four years and by ordering that his sentence be served in the Department of Correction. After a careful review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES and NORMA MCGEE OGLE, JJ., joined.

Carrie W. Kersh, Clarksville, Tennessee (at trial); Michael R. Jones, District Public Defender, and Charles S. Bloodworth, Assistant District Public Defender (on appeal), for the appellant, Carl Dean Bolin.

Paul G. Summers, Attorney General and Reporter; Russell S. Baldwin, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and James B. Crenshaw, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant was indicted for first degree premeditated murder for fatally shooting his twenty-three-year-old son with a .20 gauge shotgun, but was convicted of the lesser-included offense of reckless homicide after a four-day trial ending on July 29, 1999. After a sentencing hearing, the trial court sentenced the defendant to the maximum penalty of four years incarceration in the Department of Correction. The defendant appeals only the sentence imposed by the trial court, arguing that the length of his sentence is excessive and that he should have received an alternative sentence.

# FACTUAL BACKGROUND

During the early morning hours of January 16, 1998, the defendant and his son, the victim, returned home from a night of playing pool at a local poolroom in Clarksville. The defendant's wife and mother of the victim, Deborah Bolin, along with the victim's pregnant girlfriend and her two children, also resided in the home. Both Mrs. Bolin and the victim's girlfriend, Heather Downs, testified at trial that they were awakened by a loud noise at the front door around 3:00 a.m. The defendant and the victim, arguing loudly with each other, entered the house and began scuffling in the living room floor.

The defendant testified at trial that after the victim beat the "crap out" of him and Mrs. Bolin and Ms. Downs pulled the victim off of him, he went into his bedroom and retrieved his .20 gauge shotgun, with his only intention being to hit the victim with the gun if the victim attacked him again. Seeing the defendant with a gun, the victim went out the back door of the house into the backyard. The defendant stepped out onto the back porch where he fired the shotgun into the ground, testifying that he thought he had emptied the gun. The victim then walked around to the front of the house and broke a window out of the defendant's vehicle. The defendant went back inside the house and then out the front door where he saw the victim by his vehicle. The defendant testified that he kept his .38 Derringer in his vehicle and that he saw a shiny object in the victim's hand. He said that the victim did not come toward him; instead, the victim walked out into the street, waved his arms at the defendant, and told the defendant to come out into the street with him. The defendant said that as he was slinging the shotgun up onto a retainer wall alongside his house, it discharged, striking the victim in the neck area. The defendant testified that he never aimed the gun at the victim and did not intend to kill the victim.

Deborah Bolin testified that when the defendant and the victim arrived home, the victim, who appeared to be very mad, entered the house first, took his pool stick out of its case, and told her not to let the defendant in the house. Once the defendant came in, the two began arguing and ended up "in a pile" in the living room floor. Mrs. Bolin was able to get the pool stick and throw it behind the sofa. After the fighting had temporarily subsided, the victim went out the back door and into the backyard. She and the defendant then went outside and stood on the back porch. The defendant and the victim continued to argue. She and the defendant went back inside the house where the defendant went to their bedroom and retrieved his shotgun. Mrs. Bolin said she grabbed the gun and told the defendant, "[D]on't do this." The defendant then punched her in the chest, causing her to let go of the gun, and left the room with the gun. She next heard a "bang", which caused her to call 9-1-1. However, before she could complete the call, she heard a noise coming from the front of the house. She hung up the telephone without completing the call and went out the front door where she saw the victim breaking a window out of the defendant's vehicle with his fist. She said that the victim started to open the door of the defendant's vehicle but suddenly headed toward the street instead. By that time, she said the defendant had come outside with the shotgun, and she went back inside the house to call her sister and brother-in-law, Donna and Steve Terry, who lived across the street, for assistance. She then walked out to the front porch and heard the victim and the defendant still arguing. She next heard a gunshot after which the defendant came walking up the

sidewalk and told her, "I shot him." Mrs. Bolin again called 9-1-1, completing the call this time, and then ran outside to check on the victim. She found the victim lying in the street, not breathing and with no pulse. She testified that the defendant came back outside with the shotgun and laid it on the retainer wall.

Mrs. Bolin further testified that during the incident she never saw the victim take out his pocketknife that he always carried with him, or do anything threatening toward the defendant. However, during cross-examination, when asked if the victim attacked the defendant in the house, she responded, "I guess you would say yes."

Heather Downs, who gave birth to the victim's child eleven days after the shooting, testified that the defendant and the victim left the house around 5:30 p.m. on January 15, 1998, to play in a pool tournament. She was later awakened between 3:00 and 3:30 a.m. by someone beating on the front door. The defendant and the victim came in the house, screaming at each other and then wrestling on the floor. The fighting continued into the dining room where she took a long flashlight away from the victim and the defendant said he was going to get his gun. The victim then left out the backdoor. She said the defendant came out of his bedroom with the shotgun and went out the backdoor. Ms. Downs heard one gunshot at the side of the house and then heard the sound of breaking glass coming from the front of the house. Staying inside the house with her two small children, she heard the defendant and victim yelling at each other and then another gunshot coming from the front of the house. Mrs. Bolin then yelled in the house to her that the defendant had shot the victim. Ms. Downs ran outside where she passed the defendant on the sidewalk and asked him if he had shot the victim. The defendant replied, "I told him I was going to fucking shoot him." Ms. Downs found the victim, gurgling for breath, lying in the street and laid his head in her lap. She said that she saw the victim's pocketknife "maybe a couple of feet" from his body in the street; however, she never saw the victim hit the defendant with any object or with his fists when they were in the house.

Donna Terry, the defendant's sister-in-law who lived across the street, testified that she was awakened on the morning of the incident by "very loud yelling." She opened her front door and saw the defendant standing in his driveway with something in his hand. Her sister, Mrs. Bolin, called her and said that the defendant had a gun and asked her to wake her husband so that he could try to stop the fighting between the defendant and the victim. Mrs. Terry said she then went outside to her front yard and saw the defendant and the victim screaming at each other about the broken window in the defendant's vehicle. She yelled out to the victim to come inside her house in an attempt to stop the fighting. The victim, standing by Mrs. Terry's car which was parked in the street in front of her house, had his hands raised up over his shoulders. Mrs. Terry said that she did not see anything in the victim's hands, nor did he make any gestures with his hands. The victim waved his arms and asked the defendant what he was going to do. She said the defendant told the victim that he was trespassing and then walked down his driveway with the gun pointed to the ground. When the defendant reached the street, he told the victim either "it will be" or "it would be" trespassing, raised his gun, and shot the victim. Mrs. Terry said that she looked back to where the victim had been standing but could not see him. She said the defendant went inside his house after

he shot the victim, and when he came back outside, he inquired as to whether the victim was breathing. When Mrs. Terry told the defendant that he was not, the defendant said, "I guess he's dead. I guess I am going to jail." The defendant then laid his gun on the retainer wall. Mrs. Terry said that she never saw a weapon in the victim's hands and only saw the knife recovered at the scene near her car after a police officer showed it to her.

Other trial testimony consisted, in part, of the Clarksville police officers and detectives who responded to the scene and conducted the ensuing investigation, as well as the employee of the Montgomery County 911 Center who received the emergency call from Mrs. Bolin and later spoke to the defendant by telephone, during which conversation the defendant told her that he had shot his son because he thought he was breaking into his vehicle. The medical examiner who performed the autopsy on the victim's body also testified as to the extent of the victim's injuries and the cause of death. Other witnesses included Steve Terry, the defendant's brother-in-law, who testified that he was inside his house when he heard the gunshot, and relatives and friends of the defendant who testified as character witnesses. A nurse from the jail infirmary at the Montgomery County Sheriff's Department also testified regarding the medical treatment the defendant received at the jail for his black eye and bruising over his rib area.

## ANALYSIS
### I. Length of Sentence

The defendant argues that the trial court erred in imposing the maximum sentence of four years, contending that the trial court sentenced him "to a term that was in excess of that supported by the enhancing and mitigating factors." When a defendant complains of his or her sentence, we must conduct a *de novo* review with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). The burden of showing that the sentence is improper is upon the appealing party. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Cmts. This presumption, however, is conditioned upon an affirmative showing in the record that the trial court considered the sentencing principles and all the relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn.1991).

The Sentencing Reform Act of 1989 established specific procedures that must be followed in sentencing. These procedures, codified at Tenn. Code Ann. § 40-35-210, mandate the court's consideration of the following: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and (6) any statement the defendant wishes to make in his own behalf about sentencing.

This section further provides that the minimum sentence within the range is the presumptive sentence. The court must begin with the minimum sentence and enhance that sentence to appropriately reflect any statutory enhancement factors that the court finds to be present. After enhancing the sentence, the court must reduce the sentence giving consideration to the weight of any

mitigating factors that the court finds. The weight to be given each factor is left to the discretion of the trial judge. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

Having been convicted of a Class D felony as a Range I, standard offender, the defendant was subject to a minimum sentence of two years and a maximum sentence of four years. The trial court found that two enhancement factors were applicable: the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, Tenn. Code Ann. § 40-35-114(1), and the defendant used a firearm in the commission of the offense, Tenn. Code Ann. § 40-35-114(9). In applying enhancement factor (1), the trial court gave this factor "some weight" but not as much as enhancement factor (9). The trial court based the application of enhancement factor (1) upon Mrs. Bolin's testimony at the sentencing hearing wherein she stated that the defendant carried his .38 Derringer concealed in the waistband of his pants under his shirt every time he left the house. In applying enhancement factor (9), the trial court found that the use of the firearm was a "very heavy enhancement factor."

Defense counsel urged the trial court to consider the following mitigating factors:

> (2) The defendant acted under strong provocation;
>
> (3) Substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;
>
> (11) The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct; and
>
> (13) Any other factor consistent with the purposes of this chapter.[1]

Tenn. Code Ann. § 40-35-113(2), (3), (11), & (13).

In addition, defense counsel asked the trial court to consider the non-statutory mitigating factors of remorse shown by the defendant at the sentencing hearing and the defendant's lack of a criminal record. At the hearing, the defendant testified that he was receiving counseling and taking medication for emotional stress. When asked if he regretted what happened with his son, the defendant said, "I can't explain how I feel about it. It's just something that – it's going to be with me for the rest of my life."

---

[1] Trial defense counsel did not specifically argue at the sentencing hearing that factor (13) should be applied, but she did mention that the defendant had never been in trouble before and that he had shown remorse when testifying at the sentencing hearing. Appellate defense counsel argues that factor (13) was applicable but does not claim, as did trial defense counsel, that factor (3) should be applied.

The trial court noted that, at several time intervals during the incident, the defendant could have ended the fight with his son without further violence. The court further found that the defendant's conduct immediately following the shooting was "absolutely void of remorse."

The trial court then explained the basis for concluding that the defendant should be sentenced to four years, the maximum sentence, to be served in confinement:

> Now, I realize that the sentence should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. And it's the Court's opinion in this case based on the enhancing factors and weighing those with what I've already said about mitigating factors – let me be sure I haven't skipped any of those – and taking into account everything in this case, the length of the sentence in this case will be four years. And the defendant will be confined.

The trial court applied enhancement factor (1) because of the testimony that the defendant carried a Derringer as well as another weapon and stated that this factor was afforded "some weight." The court also applied enhancement factor (9), that the defendant possessed or employed a .20 gauge shotgun during the offense, and this factor is not contested by the defendant.

The trial court determined that the following mitigating factors were not applicable: factor (2), that the defendant acted under strong provocation; factor (3), that substantial grounds existed to excuse or justify the defendant's conduct; and factor (11), that the offense was committed under such unusual circumstances to make it unlikely that his conduct was motivated by a sustained intent to violate the law. Apparently, the trial court found the fact that the defendant's prior record consisted only of two speeding convictions to be an applicable mitigating factor and fit it into factor (13).

Based upon our review, we cannot conclude that the trial court, grounding its findings that mitigating factors (2), (3), and (11) did not apply, after conducting a detailed review of the facts of the killing, erred in its determination that none of these three factors applied. Thus, even if the trial court erred in applying enhancement factor (1), the fact that great weight was given to enhancement factor (9), and only "some weight" to enhancement factor (1), results in our conclusion that the sentence of four years was appropriate. Even if enhancement factor (1) did not apply, that fact would not entitle the defendant to a reduction of the sentence. See State v. Spratt, 31 S.W.3d 587, 609 (Tenn. Crim. App. 2000).

## II. Alternative Sentencing

Arguing that the trial court ruled that "in every homicide by firearm the Defendant must be incarcerated," the defendant contends that the trial court erred in failing to impose an alternative sentence. Specifically, he argues that he should have received split confinement, a community corrections sentence, or regular or intensive probation instead of confinement.

An especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6). A trial court must presume that a defendant sentenced to eight years or less and who is not an offender for whom incarceration is a priority is subject to alternative sentencing. State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993). It is further presumed that a sentence other than incarceration would result in successful rehabilitation unless rebutted by sufficient evidence in the record. Id. at 380.

Under the 1989 Sentencing Act, sentences that involve confinement are to be based on the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1); see State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). A trial court may consider the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113, 40-35-114, as they are relevant to the section 40-35-103(1) considerations. Boston, 938 S.W.2d at 438; State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). The trial court should also consider the defendant's potential for rehabilitation when determining whether an alternative sentence would be appropriate. Zeolia, 928 S.W.2d at 461.

In determining whether to grant or deny probation, a trial court should consider the circumstances of the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. State v. Boyd, 925 S.W.2d 237, 244 (Tenn. Crim. App. 1995); State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). There is no mathematical equation to be utilized in determining sentencing alternatives. Not only should the sentence fit the offense, but it should fit the offender, as well. Tenn. Code Ann. § 40-35-103(2); State v. Boggs, 932 S.W.2d 467, 476-77 (Tenn. Crim. App. 1996).

In this case, the trial court found that confinement was necessary to avoid depreciating the seriousness of the offense and to provide a deterrence to others likely to commit similar offenses, giving greater weight to avoiding depreciation of the seriousness of the offense. In its ruling, the trial court stated, in part:

> The issue for the Court is whether confinement is necessary to avoid depreciating the seriousness of the offense.
>
> And it may be that we – our society has gotten to the point where people get in a dispute, weapons come out, and somebody dies, and no confinement is imposed. In this case for me not to impose confinement, in my opinion, would depreciate the seriousness of this offense to an unbelievably inappropriate degree.
>
> Now, is confinement particularly suited to provide a defective [sic] deterrence to others likely to commit similar offenses? In this case I think it is.

Although it is clear that a defendant cannot be denied probation or alternative sentencing solely because a death occurred due to the commission of a criminal act, State v. Butler, 880 S.W.2d 395, 400-01 (Tenn. Crim. App. 1994), and that the record must have proof of the need for deterrence before an alternative sentence may be denied for this reason, State v. Hooper, 29 S.W.3d 1, 8-12 (Tenn. 2000), it appears that the trial court's ruling was not limited to these reasons.

We conclude that the findings of the trial court as to the denial of probation are entitled to a presumption of correctness because it is clear that the trial court considered the relevant facts, circumstances, and sentencing principles. The record supports the trial court's denial of probation, and, accordingly, we affirm its judgment in this regard.

## CONCLUSION

After reviewing the record in this case, we conclude that the trial court did not err in imposing the maximum sentence of four years or in denying the defendant an alternative sentence. Accordingly, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE