IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 16, 2003

## STATE OF TENNESSEE v. TREACY F. LEWIS

**Direct Appeal from the Circuit Court for Humphreys County**
**No. 9782      Robert E. Burch, Judge**

---

**No. M2002-01694-CCA-R3-CD - Filed December 16, 2003**

---

Defendant, Treacy F. Lewis, entered a plea of nolo contendre to the offense of murder in the second degree. Following a sentencing hearing, the trial court sentenced Defendant to twenty-three years in the Tennessee Department of Correction. Defendant appeals the length of her sentence, arguing that the trial court misapplied enhancement factor (4), the victim was particularly vulnerable because of age and physical disabilities, and failed to give sufficient consideration to the applicable mitigating factors. Defendant does not challenge the application of enhancement factor (9), based upon the use of a gun in the commission of the offense. Based on a review of the record, we conclude that the trial court improperly applied enhancement factor (4) in its sentencing determinations. Accordingly, we modify the judgment of the trial court to reduce the sentence to twenty-two years.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Modified**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOE G. RILEY and ALAN E. GLENN, JJ., joined.

William B. Lockert, III, District Public Defender; and Richard D. Taylor, Jr., Assistant Public Defender, for the appellant, Treacy F. Lewis.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; Dan Mitchum Alsobrooks, District Attorney General; and Lisa C. Donegan, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

According to the summary of the evidence presented by the State at the plea submission hearing, the victim, Robin Forrest, was shot once in the chest with a nine-millimeter gun and died a short time later from that wound. The bullet traveled through the victim's lungs and severed his

aorta causing the victim to bleed to death. The autopsy report was not made a part of the record. Defendant told Larry Kennerly later that afternoon that she had shot and killed the victim. Defendant accompanied Mr. Kennerly back to the victim's home and then fled to Kentucky where she was subsequently apprehended.

At the sentencing hearing, Charles Forrest, the victim's brother, testified that the victim was sixty-three years old at the time of his death. As a result of certain birth injuries, the victim had impaired eyesight which grew progressively worse as he aged. In addition, the victim had contracted polio as a child and wore a brace on his left leg to assist him in walking. Mr. Forrest said that his brother's physical disabilities increased with age and, at the time of his death, he needed to hold on to something when he walked. Mr. Forrest stated that the victim was a heavy smoker and there were always a lot of beer cans around the house. On cross-examination, Mr. Forrest said that his brother could drive and read books.

Mr. Forrest testified that Defendant first started "hanging around" the victim when she was a teenager. From that time on, Defendant periodically lived with the victim. The father of Defendant's daughter, Meagan, was James Duncan, but Meagan referred to the victim as "papa." The victim had worked as a machinist for TVA for twenty years and had retired as a result of an early retirement program about two years prior to his death. As far as Mr. Forrest knew, Defendant was not employed.

Mr. Forrest learned of his brother's death around 5:00 or 6:00 p.m. when Larry Kennerly told Mr. Forrest about the shooting. Mr. Forrest went to the victim's house, saw the blood stains in the living room, and returned home to wait for a deputy sheriff. The police later asked Mr. Forrest to search the victim's home, and he found a nine-millimeter gun in Defendant's dresser during his search. Mr. Forrest said that the door to the room where the victim lay was locked.

Mr. Forrest said that he was the administrator of his brother's estate. The victim had a government life insurance policy in the amount of $36,000, and Defendant was the beneficiary. The bulk of the victim's estate was left to Defendant, but the victim's son, T.C. Forrest, inherited the victim's house and one acre of land. A mortgage in the amount of $15,000 had been taken out against the house one month before the victim died. Mr. Forrest admitted that he did not approve of the victim's relationship with Defendant.

Joe Craig, an agent with the Tennessee Bureau of Investigation, testified that he arrived at the victim's home around 7:30 or 8:00 p.m. He said that the investigation was focused on Defendant from the beginning based on Mr. Kennerly's and James Duncan's information. A nine-millimeter casing was found on the floor in the living room near a coffee table in front of a chair. The chair's cushion was stained with blood. A crime scene videotape of the premises showed that photographs of Defendant's daughter, Meagan, were strewn on the floor near the coffee table. The blood stains on the plywood floor in the hall indicated that the victim had been dragged into his bedroom. There was a great deal of blood on the victim's hands and chest. The outside door knob on the victim's bedroom door had blood stains, but not the inside knob. The victim's glasses were discovered in a

kitchen cabinet drawer, and blood spots were discovered on both the cabinet and the glasses. According to the videotape, the telephones in the house had been unplugged.

Agent Craig left the crime scene and requested Charles Forrest to continue searching the house. At the police station, Defendant's description was entered in NCIC between 11:30 p.m. and midnight. Around 12:30 a.m., the investigating officers were notified that Defendant had been apprehended by police officers in Christian County, Kentucky. Agent Craig drove to Kentucky, arriving at approximately 2:00 a.m. Defendant had initially been stopped for a suspected driving under the influence offense, and Agent Craig waited until 6:00 a.m. before he spoke with Defendant in order to give her time to "sober up." Agent Craig testified that Defendant was coherent during the interview although he did notice some bruising on her face. Agent Craig said that he later found the victim's wallet in Defendant's car, but the wallet did not contain any money.

On cross-examination, Agent Craig admitted that he did not know how the wallet came to be in Defendant's car. He also admitted that certain physical evidence had been disturbed between the initial videotaping of the premises and the later photographs of the scene. Agent Craig acknowledged that the victim kept handguns with him in the living room, but he did not verify how many weapons were in the home.

Ronnie Toungette, the Humphreys County Sheriff, testified that there had been two recent calls concerning domestic altercations at the victim's home. The first call was received around 2:00 or 3:00 a.m. approximately four months before the victim died. When Sheriff Toungette arrived at the scene, Defendant accused T.C. Forrest of assaulting her although there were no visible signs of a struggle. It was apparent to Sheriff Toungette that everyone in the house had been drinking, so he told them all to go to bed. At 6:56 a.m. on the same day, a second complaint was recorded indicating that Forrest was holding down Defendant who had a gun in her hand. A child was screaming in the background. Police officers later retrieved a nine-millimeter gun but no arrests were made following this incident. Sheriff Toungette said that he did not really know what happened that morning. He later returned the gun to the victim.

Larry Kennerly testified that he had known the victim about forty-six years and Defendant about fifteen or sixteen years. Mr. Kennerly said that he did not always get along with Defendant. If they were not speaking, Mr. Kennerly would not go into the victim's house. Mr. Kennerly said that the victim's and Defendant's relationship contained a lot of "hollering and screaming," but he had never seen the victim strike Defendant. Mr. Kennerly said that the victim wore a leg brace. When he sat down, the victim had to unlock the brace but he had no problem locking or unlocking the brace. Mr. Kennerly never saw the victim without his glasses.

Defendant arrived unexpectedly at Mr. Kennerly's house around 2:00 or 3:00 p.m. the afternoon of the victim's death. Defendant appeared sober when she arrived at his house. Mr. Kennerly and Defendant drank two or three beers. As they drank, Defendant cried about losing custody of her daughter, Meagan. At Defendant's suggestion, they went into town and Defendant bought some more beer. After they returned to Mr. Kennerly's house, Defendant asked him if he

3

wanted to "visit the bedroom" and the two engaged in sex. Afterwards, Defendant continued to cry. Mr. Kennerly said that Defendant suddenly told him that she had shot the victim in the chest. Mr. Kennerly said that he thought "it was the beer talking," but asked Defendant to go with him to the victim's house so he could see whether or not she was telling the truth. Mr. Kennerly drove Defendant's car to the victim's home. Mr. Kennerly opened the front door and hollered for the victim, but the victim didn't answer. Mr. Kennerly then walked through the rooms except for the locked bedroom. When he saw the blood on the floor, Mr. Kennerly left the house on foot, and Defendant drove off.

On cross-examination, Mr. Kennerly said that he and Defendant had a sexual relationship about two years prior to the victim's death. He stopped the relationship when Defendant indicated to him that she wanted them to become serious.

James Duncan, Meagan's father, testified that he and Defendant had never married. At the time of the sentencing hearing, Mr. Duncan had custody of Meagan. Defendant came to his house around 5:00 p.m. on the afternoon the victim died. Defendant asked Mr. Duncan to take her to Nashville so that she could catch an airplane to visit her mother. The telephone rang while they were talking, and Mr. Duncan's next-door neighbor told him that the victim had been shot. When he got off the telephone, Mr. Duncan asked Defendant if she had shot the victim. Defendant replied that Mr. Duncan would have done the same thing if someone had tried to take Taylor, Mr. Duncan's other daughter, away. Mr. Duncan said he removed the car keys from Defendant's car and told her there was no need to run. The two struggled. Defendant broke away and grabbed a piece of firewood from Mr. Duncan's porch. She told Mr. Duncan that she was going to burn his house down. Mr. Duncan said he threw the car keys at her, and Defendant drove away.

Dr. William Bernet testified that he performed a psychiatric evaluation of Defendant at the defense's request which consisted of two personal interviews, a review of Defendant's medical and psychiatric records, a review of the records pertaining to Defendant's arrest, and the administration of a Structured Interview of Reported Symptoms test and the Mini-Mental State Examination. Dr. Bernet testified that Defendant told him she first began a sexual relationship with the victim when she was fourteen years old and moved in with him when she was about twenty years old. Defendant had been sexually abused when she was four or five years old. As a young adult, Defendant experienced panic attacks and developed a dependency on alcohol, in part, to relieve her anxiety. Defendant also suffered periodically from depression and tried to commit suicide once with a mixture of pills and alcohol. Dr. Bernet described Defendant's and the victim's relationship as both dependent and hostile. Defendant told Dr. Bernet that the victim became physically abusive to her when he was intoxicated, and these incidents occurred frequently.

Dr. Bernet testified that Defendant's situation deteriorated in the three or four months prior to the victim's death. Following the incidents with the victim's son, T.C., the Department of Human Services removed Meagan from Defendant's custody because there were loaded weapons in the home and the adults of the household were drinking. Defendant was attempting to comply with all of the department's conditions to her regaining custody. During this process, however, Meagan

4

made certain comments to the social worker that indicated the child may have been sexually abused. The victim would not meet with the social worker which was a condition of Megan being returned to live with Defendant.

Defendant told Dr. Bernet that on the day she shot the victim, the two of them were arguing over the victim's refusal to meet with the social worker. The victim also refused to lock up the weapons in the house which was another condition to Defendant regaining custody. Defendant showed the victim photographs of Meagan and kept asking him why would he would not just tell the social worker that he had not molested Meagan. At some point, Defendant grabbed the victim's gun from him and was holding it in her hand. Finally, the victim said that he could not say that he "didn't." Defendant interpreted this statement as an admission that the victim had sexually molested her daughter, and Defendant shot the victim in the chest.

Dr. Bernet testified that, in his opinion, Defendant then entered a dissociative state for the next few hours as a result of this trauma. Toward the end of her visit with Mr. Kennerly, Defendant saw some blood on her ankle, came out of her dissociative state and confessed to Mr. Kennerly that she had shot the victim. Dr. Bernet, however, could not give an opinion as to whether Defendant's dissociation began before, during or after the shooting. He could only testify that Defendant was in a dissociative state when she first arrived at Mr. Kennerly's home.

Defendant was also evaluated by the Kentucky Correctional Psychiatric Center immediately following her arrest in Christian County. At that time, Defendant was delusional and paranoid. After a three-week treatment of Zyprexa, Seroquel and antidepressants, Defendant no longer experienced hallucinations.

At the conclusion of the sentencing hearing, the trial court sentenced Defendant as a Range I, standard offender to twenty-three years imprisonment. In determining Defendant's sentence, the trial court applied enhancement factor (1), Defendant had a previous history of criminal convictions; factor (4), the victim was particularly vulnerable because of physical disabilities; and factor (9), Defendant used a firearm in the commission of the offense. Tenn. Code Ann. §§ 40-35-114(1), (4) and (9). The trial court assigned no weight to factor (1), great weight to factor (4) and medium weight to factor (9).

Regarding mitigation of Defendant's sentence, the trial court found that the evidence was insufficient to support a finding that Defendant killed the victim because she believed that he had sexually molested her daughter. The trial court found, however, that there was sufficient evidence to support a finding that the victim's failure to cooperate in regaining custody of Defendant's daughter provided some provocation for Defendant's actions under factor (2), but the trial court assigned this mitigating factor only minimal weight. The trial court also assigned slight weight to factor (8), that Defendant was suffering from a mental condition that reduced her culpability, and factor (13), that Defendant's criminal history does not evidence a clear disregard for the laws and morals of society. *Id.* §§ -102(5), -113(2), (8) and (13). The trial court assigned no weight to the fact that Defendant had no prior felony convictions or that she was a mother.

5

Defendant now appeals the length of her sentence. She does not question the trial court's application of enhancement factor (9), but argues that the trial court inappropriately considered factor (4) in determining the length of her sentence. Defendant also contends that the trial court did not assign the proper weight to the applicable mitigating factors, particularly her mental state on the day of the crime. If factor (4) is removed from consideration and if proper weight is assigned to mitigating factors (2), (8) and (13), Defendant argues that she should be sentenced to the minimum penalty of fifteen years.

**Analysis**

We note initially that at the time of the sentencing hearing, there were twenty-two statutory enhancement factors listed in Tennessee Code Annotated section 40-35-114. Subsequently, in Public Acts 2002, ch. 849, § 2, the legislature added a twenty-third enhancement factor, but listed it as enhancement factor (1) and renumbered previous factors (1) through (22) as (2) through (23). *See* Tenn. Code Ann. § 40-35-114 (2002 Supp.). In this opinion, we will refer to the enhancement factors of Tennessee Code Annotated section 40-35-114 as they existed at the time of the sentencing hearing.

When a defendant challenges the length of a sentence, this Court conducts a *de novo* review of the record, with a presumption that the trial court's determinations are correct if the record shows that the trial judge considered the sentencing principles and all relevant facts and circumstances. Tenn. Code Ann. § 40-35-401(d); *State v. Pettus,* 986 S.W.2d 540, 543 (Tenn. 1999). The burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. §40-35-401(d), Sentencing Commission Comments. In reviewing the length of the sentence, this court must consider: (1) the evidence presented at the trial and sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any appropriate enhancement and mitigating factors; and (6) any statements made by Defendant on his own behalf. Tenn. Code Ann. § 40-35-210(b).

Second degree murder is a Class A felony. *Id*. § 39-13-210(b). As a Range I offender, Defendant is subject to a sentence of not less than fifteen years nor more than twenty-five years. *Id*. § 40-35-112(a)(1). The presumptive sentence for a Class A felony is the midpoint of the range if there are no enhancement or mitigating factors. *Id*. § 40-35-210(c). If both enhancing and mitigating factors are present, the trial court must start at the midpoint of the range, enhance the sentence within the range as appropriate for the enhancing factors, and then reduce the sentence as appropriate for the mitigating factors. *Id*. § 40-35-210(e).

The weight placed on one factor by the trial court may vary from that assigned to another, and the legislature has specifically declined to assign a numerical value to mitigating and enhancement factors. *Id*. § 40-35-210 Sentencing Commission Comments; *State v. Spratt*, 31 S.W.3d 587, 606 (Tenn. Crim. App. 2000). The weight accorded enhancing and mitigating factors is within the trial court's discretion so long as the record supports its findings and the findings comply with sentencing principles. *State v. Kelley*, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000).

Defendant contends that the trial court misapplied factor (4) in determining the length of Defendant's sentence. Defendant argues that the victim's physical disabilities were not a factor in the commission of the crime, and that the victim was no more vulnerable than any other person under the circumstances of the offense. The State, on the other hand, argues that the victim was particularly vulnerable because he was sixty-three years old and physically disabled as a result of his shortened left leg and his impaired vision.

The trial court may consider several statutorily enumerated enhancement factors when determining whether a departure from the minimum penalty for an offense is justified in a particular situation. Tenn. Code Ann. § 40-35-114, Sentencing Commission Comments. The enhancement factor, however, must be appropriate to the offense. *Id.* Accordingly, the trial court must consider "the nature of the offense and the manner in which it was committed" in determining whether to apply factor (4). *State v. Poole*, 945 S.W.2d 93, 97 (Tenn. 1997). Because the trial court failed to specifically state which facts showed that the commission of the crime involved factors related to the victim's disabilities, we will review the trial court's determination *de novo* without a presumption of correctness. *See id.* at 96.

A sentence may be enhanced if "a victim of the offense was particularly vulnerable because of age or physical or mental disability . . . ." Tenn. Code Ann. § 40-35-114(4). This vulnerability "relates more to the natural physical and mental limitations of the victim than merely the victim's age." *State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993). The State bears the burden of proving that the mental or physical limitations peculiar to the victim rendered the victim particularly vulnerable. *Id.*; *Spratt*, 31 S.W.3d at 607. In determining whether the State has met its burden of proof, the trial court should consider whether the victim's age or disability "demonstrated an inability to resist the crime, summon help or testify at a later date." *Poole*, 945 S.W.2d at 96.

The victim in this situation was about sixty-three years old, and the evidence established that he had poor eyesight and walked with a limp due to his childhood bout with polio. Because of his shortened left leg, the victim wore a leg brace which had to be unlocked before he sat down. On the other hand, the victim drove and enjoyed reading. He worked as a machinist for twenty years and retired approximately two years before the offense because he chose to participate in an early retirement program offered by his employer.

Although a victim may be vulnerable because of physical limitations in a general sense, that vulnerability may not have any relevance to the offense committed against him. *State v. Lewis*, 44 S.W.3d 501, 505 (Tenn. 2001). In this instance, the victim was seated in a chair in the living room while Defendant apparently stood a short distance away. Defendant was attempting to regain custody of her daughter, and the two were arguing over the victim's failure to cooperate with the Department of Human Services. Their argument intensified, and Defendant shot the victim in the chest. The bullet pierced the victim's lung and severed his aorta. There is no evidence that Defendant held the gun on the victim for any length of time or that the victim had any time to defend himself. There is also no proof that the victim's difficulties in walking gave Defendant any

7

advantage in shooting him. An offense may be committed in such a manner that the victim's purported vulnerability is irrelevant. *Poole*, 945 S.W.2d at 97.

In *State v. Butler*, 900 S.W.2d 305 (Tenn. Crim. App. 1994), this Court examined the applicability of enhancement factor (4) in a similar situation. In *Butler,* the victim was shot and killed when she came upon the defendant unexpectedly while he was ingesting cocaine. Although the State established that the victim was elderly and was dependent upon a cane when she walked, this Court concluded that the victim's age and physical limitations were not factors in the commission of the offense. *Butler*, 900 S.W.2d at 313. We noted that,

> [i]f a weight lifter, football player, or any other person, male or female, who possessed adequate strength to resist a crime against the person, had entered the basement on the morning in question, that person's strength and ability would not have permitted him or her to resist the crime committed by the appellant. . . . No person can resist an unexpected firing of a weapon from a distance.

*Id.*

The State argues that the victim's blood-splattered glasses were found in a kitchen cabinet drawer some distance away from the victim. Based on this factor, the State is apparently arguing that the victim's bad eyesight impaired his ability to seek help after he was shot. A victim may be particularly vulnerable for purposes of factor (4) if his or her physical limitations impede the victim's ability to summon assistance after the commission of an offense. *Butler*, 900 S.W.2d at 313. However, the State must show that the victim's physical limitations were relevant to his or her inability to seek help. *Lewis*, 44 S.W.3d at 505.

Although Charles Forrest testified that his brother was "legally blind," he defined the condition in layman terms as not being able to see "very well" without glasses. There is no indication in the record that the victim, even without his glasses, would not have been able to find his way through his home or use a telephone had his wound been less severe.

Defendant's actions after the shooting were clearly reprehensible. Not only did she remove the victim's glasses, but she drug his body into a bedroom, locked the door from the outside and unplugged the telephones. The State did not introduce the autopsy report, however, and there was no medical testimony as to how long the victim lived after the injury or even if the victim was conscious for any period of time. It is doubtful that any victim, with or without glasses, could have broken down a locked door while bleeding to death from a severed aorta. Moreover, the record indicates that the victim was rendered unable to summon help by his injury. Agent Craig testified that the victim's body lay on the floor in the bedroom. Although there was blood on the victim's hands, there were no blood stains on the inside of the door.

No doubt the victim's disabilities made him vulnerable to certain factual situations involving criminal activities by others. Based upon the nature and circumstances of this offense, however, we

cannot conclude that the victim's poor eyesight or impaired walking ability were factors in the commission of the crime. Accordingly, upon our *de novo* review of Defendant's sentence, we find that the trial court erred in its application of enhancement factor (4) and reduce Defendant's sentence by one year.

Defendant also argues that the trial court assigned too little weight to the mitigating factors, particularly Defendant's mental state at the time of the shooting. However, it is well established that the weight to be given to each enhancement and mitigating factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. *State v. Zonge*, 973 S.W.2d 250, 259 (Tenn. Crim. App. 1997); *State v. Baxter*, 938 S.W.2d 697, 705 (Tenn. Crim. App. 1996). The record indicates that the trial court complied with the sentencing purposes and principles in determining the weight assigned to the applicable mitigating factors, and the record supports the trial court's findings. The trial court did not abuse its discretion when it determined the weight of the mitigating factors in this case.

## CONCLUSION

Because the trial court improperly applied enhancement factor (4), we reduce Defendant's sentence for second degree murder by one year to a sentence of twenty-two years. We otherwise affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE