IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 15, 2004

## STATE OF TENNESSEE v. STANLEY CRAIG HUGHES

**Direct Appeal from the Criminal Court for Bradley County**
No. M-01-413   Carroll L. Ross, Judge

**No. E2004-00105-CCA-R3-CD- Filed September 24, 2004**

Defendant, Stanley Craig Hughes, was indicted for one count of second degree murder, one count of aggravated assault, two counts of reckless endangerment, and one count of unlawful possession of a weapon. The State entered a *nolle prosequi* on the unlawful possession of a weapon charge, and Defendant was tried on the other charges. Defendant's first trial ended in a mistrial. At the conclusion of Defendant's second trial, the jury found Defendant guilty of aggravated assault and not guilty of the charge of second degree murder and both counts of reckless endangerment. Following a sentencing hearing, the trial court sentenced Defendant to six years in the Tennessee Department of Correction. On appeal, Defendant argues that the evidence was insufficient to support his conviction for aggravated assault, and that the trial court improperly applied enhancement factors and failed to consider mitigating factors in determining the length of Defendant's sentence. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

THOMAS T. WOODALL, delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

Charles M. Corn, District Public Defender; and A. Wayne Carter, Assistant Public Defender, for the appellant, Stanley Craig Hughes.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Shari Tayloe, Assistant District Attorney General, for the appellee, the State of Tennessee.

### OPINION

Ginger Sample and her mother, Evelyn Sample, were driving toward Cleveland, Tennessee, when they observed a green car attempting to pull in between a truck and a Honda automobile. Ms. Sample said that the green car then hit the back end of the truck. Defendant, the driver of the green car, got out of his vehicle and walked toward the truck. Although Ms. Sample said that she did not

see Defendant's face, he appeared angry and was yelling. Ms. Sample said that Defendant returned to his car to retrieve something, but she did not see what the object was.

Evelyn Sample said that the truck, the green car and the Honda stopped after Defendant hit the rear end of the truck. The driver of the truck and Defendant started running toward each other. Ms. Sample called 911 on her cell phone because the two men looked like they were going to fight each other.

Greg Calfee also observed the altercation. He was driving home from work when he saw the three vehicles stopped on the other side of the road. Mr. Calfee said that Defendant threw something at the victim, the driver of the pick-up truck, but the victim was not hit. The victim walked toward Defendant who got back into his car. Mr. Calfee said that Defendant backed his car up but drove up over the Honda's hood which was parked behind him. Defendant's tires spun and smoke came out from the tires. The female driver of the Honda got out of her car and started gesturing at the two men. The victim leaned into Defendant's car up to the middle of his stomach, swinging his fists. The victim them backed out of Defendant's car, hunched over. Defendant got out of his car, and he and the victim stared at each other before Defendant ran across the road. Mr. Calfee said that he did not see Defendant stab the victim and left before the emergency vehicles arrived.

Brandi Park, the victim's daughter-in-law, was following the victim's truck in her Honda. She first saw Defendant driving on the other side of the road. Defendant waved at the victim and then turned his car around. He sped past the Honda and drew up even with the victim's truck. Ms. Park said that Defendant then pulled his car in between the truck and her Honda, and Ms. Park was forced to stop in order to avoid hitting Defendant's car. Ms. Park said that Defendant got out of his car and threw a hammer or an axe at the victim's truck. The victim got out of his truck and started arguing with Defendant. Ms. Park said that Defendant stabbed the victim when the two men were standing next to Defendant's car. Defendant got back into his car and, without looking in his rear view mirror, backed into her Honda. Defendant then ran away. Ms. Park said that she did not see what weapon Defendant used to stab the victim, and said that the victim was not armed. Ms. Park said that she did not know Defendant prior to the incident.

On cross-examination, Ms. Park admitted that she initially told the police that the victim was stabbed when he leaned inside Defendant's car. Ms. Park agreed that the victim could have pulled into the raceway parking lot that was twenty to thirty feet down the road where the cars would have had room to manoeuver. Ms. Park said, however, that Defendant was not blocked in. He simply could not pass the victim's car on the right because of the guard rail.

Chad Park, the victim's son, was riding with his father in the truck. He said that Defendant waved at them from the other side of the road, turned his car around, and pulled up beside the truck. Defendant swerved toward them and then forced his car in between the truck and his wife's Honda. The victim stopped his truck. As the victim was getting out of the vehicle, some object hit the truck's door. The victim and Defendant met halfway and started fighting. Mr. Park said that Defendant ran back to his car and got in, and the victim followed him. Defendant leaned out of his

-2-

car window and stabbed the victim. Mr. Park got out of the truck and went to assist his father. Defendant backed his car into Mr. Park's wife's Honda. Defendant then got out of his car and ran across the road. Mr. Park admitted that he initially told the police he was driving because his father's driver's license was revoked. Mr. Park said that he did not know the victim was dead when he gave his statement to the police. Mr. Park said that he did not know Defendant prior to the incident.

On cross-examination, Mr. Park admitted that he initially told the police that Defendant ran up to the truck with a knife, and that the victim was stabbed as he tried to get back into the truck. Mr. Park also admitted that he knew Lisa Smith, Defendant's girlfriend, because Ms. Smith used to be his father's girlfriend. Mr. Park conceded that the victim told him that the man who waved at them was Ms. Smith's new boyfriend.

David Guy, a special agent with the Tennessee Bureau of Investigation, assisted in the investigation of the incident. Agent Guy said that he found a hatchet in the front floor of the victim's truck. Agent Guy said that there were no latent prints or blood stains on the hatchet. Agent Guy found a knife in Defendant's car under a VCR in the front seat and a screwdriver in the car's console. The victim's blood was found on the knife and the driver's seat of Defendant's car. There was insufficient blood on Defendant's car door to submit for testing. Agent Guy said that there was a large quantity of blood by Defendant's car door. The blood patterns on the road indicated that the victim walked over to Ms. Park's Honda, stood for an undetermined amount of time, then walked around the front of Defendant's car, to the passenger side of his truck, then back to the rear of his truck.

Sharon Whaley, Defendant's neighbor, said that Defendant came to her house after the incident and told her that he and the victim were fighting and that Defendant had stabbed the victim. Ms. Whaley later found a knife sheath belonging to Defendant behind her couch.

Dr. Ronald Toolsie performed the autopsy on the victim. He testified that the victim died from hemorrhaging caused by a large laceration just below the armpit. Dr. Toolsie said that the knife blade lacerated the front of both lobes of the left lung. There were nine contusions or abrasions on the back of the victim's forearm and left wrist and a laceration on his left index finger. A drug screen showed the presence of amphetamine and methamphetamine in the victim's body as well as atropine which had been administered by the emergency personnel. Although Dr. Toolsie could not tell when the drugs were taken, he said that the amphetamines would have had a stimulant effect on the victim.

Dr. Toolsie testified that the knife's blade was angled upward approximately thirty degrees when it entered the victim's body. On cross-examination, Dr. Toolsie said that entry wound was consistent with Defendant sitting down and the victim standing when Defendant stabbed the victim.

Cindy Goodson testified for Defendant. She said that when she drove past the three parked vehicles, she saw a man reaching into a car and yelling. Ms. Goodson called 911.

Dr. Nelson Thorenson's testimony from Defendant's first trial was read into the record. Dr. Thorenson testified that he examined Defendant's eyes on June 25, 2002 and said that his uncorrected vision in the right eye was 20/70 and 20/60 in the left eye. Dr. Thorenson said that it would be impossible for Defendant to recognize the facial features of someone passing him in a car on the highway.

Defendant testified in his own behalf. He said that he lived about a quarter of a mile from the site of the incident. He and Lisa Smith had been dating for about two years. Prior to that, Ms. Smith had been the victim's girlfriend for about ten years. Defendant described several incidents where the victim acted aggressively toward Defendant and Ms. Smith, including one time when the victim attacked Defendant with a jack hammer.

Defendant said that he waved at the victim when they passed each other on the highway because he thought the victim was his brother-in-law. Defendant thought his brother-in-law was going to his house so he turned around. When his car drew even with the truck, Defendant recognized the victim. The victim swerved his truck toward Defendant, and Defendant dropped back, pulling in behind the truck so he could turn around at the raceway's parking lot. The victim stopped his truck, however, and Defendant had to stop also.

Defendant said that he saw the victim retrieve something from inside his truck, but he could not tell what the object was. Defendant picked up his hatchet from the floorboard and got out of the car. He threw the hatchet at the victim's feet to slow him down, but the victim stepped aside, and the hatchet hit the truck's door. Defendant got back into his car, and the victim grabbed him through the window and tried to drag him out of the car. Defendant said that he could not see what was behind him when he threw his car into reverse. The car's movement, however, knocked the victim away from the car. After Defendant's car hit the Honda, the victim came back to his car window. Defendant said that he knew he was trapped so he grabbed his knife and stabbed the victim in the side. Defendant said that he did not know how bad the victim was hurt but as soon as he determined that the victim was not going to fight anymore, Defendant ran across the road in the direction of his neighbor's house. Defendant said that he did not intend to kill the victim.

On cross-examination, Defendant admitted that during the incident with the victim involving the jack hammer, Defendant was armed with a samurai sword. Defendant admitted that he told the police that the victim had a knife in each hand. Defendant conceded that he told Detective Barry Tharpe that the victim dropped one of the knives into his lap, and he used that knife to stab the victim. Defendant explained that he said that he used the victim's knife because he was on probation resulting from a reckless endangerment conviction and was not supposed to carry knives.

Lisa Smith, Defendant's girlfriend, testified that the victim was abusive toward her during and after their relationship. Ms. Smith said that she and Defendant swore out a warrant for the victim's arrest after one of the harassment incidents. Gina Daub, the victim's sister, testified on rebuttal that Defendant, not the victim, was abusive toward Ms. Smith, and that Ms. Smith and the victim got along well.

-4-

Based on this evidence, the jury found Defendant guilty of aggravated assault and not guilty on the remaining charges.

## I. Sufficiency of the Evidence

Defendant argues that the weight of the evidence supports a finding that Defendant acted in self-defense and that his conviction of aggravated assault should be reversed. Defendant also contends that the jury's verdict finding him not guilty of second degree murder implies that the jury believed he acted in self-defense and is therefore inconsistent with a guilty verdict on the aggravated assault charge.

Consistency between verdicts in a multiple count indictment, however, is not required. *See Wiggins v. State*, 498 S.W.2d 92, 93 (Tenn. 1993). Each count is a separate indictment even though the offenses may arise out of the same criminal incident. *Id.* As our supreme court has recognized, we "will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned." *Id.* at 93-94.

As stated in count one of the indictment, Defendant was charged with second degree murder by unlawfully and knowingly killing the victim. Tenn. Code Ann. § 39-13-210. In count two of the indictment, Defendant was charged with aggravated assault by intentionally or knowingly causing the victim to reasonably fear imminent bodily injury by displaying or using a deadly weapon "to wit: a hatchet." *Id.* § 39-13-102. Although the jury found Defendant not guilty of second degree murder, that verdict is not necessarily inconsistent with a verdict of guilty of aggravated assault.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the State in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A person commits aggravated assault when he places another in reasonable fear of imminent bodily injury by displaying or using a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(B).

Defendant admitted at trial that he got out of his car, took two steps, and threw the hatchet at the victim. Viewing the evidence in a light most favorable to the State, the jury could have concluded that the victim reasonably believed that bodily injury was imminent when the hatchet sailed across the road in his direction even if they credited Defendant's testimony that the victim had some object in his hand. The victim's actions in stepping aside to avoid the hatchet lends support to this finding. The jury could have also concluded that Defendant was the aggressor in the altercation at this point and rejected Defendant's defense of self-defense as was their prerogative. This conclusion is not inconsistent with a finding that Defendant then retreated from the altercation by getting in his car and attempting to drive away. Regardless of the jury's thought processes, however, the evidence is sufficient to support Defendant's conviction for aggravated assault. Defendant is not entitled to relief on this issue.

## II. Sentencing Issues

Defendant argues that the trial court erred in applying four enhancement factors and no mitigating factors in determining the length of his sentence. At the conclusion of the sentencing hearing, the trial court found that the following enhancement factors were applicable: factor (2), Defendant had a previous history of criminal behavior; factor (9), Defendant had a previous unwillingness to comply with the conditions of a sentence involving release in the community; factor (11), Defendant had no hesitation about committing the offense where the risk to human life was high; and factor (14), Defendant committed the offense while on probation for a felony offense. Tenn. Code Ann. § 40-35-114(2), (9), (11), and (14). The trial court did not assign as much weight to factor (11) as it did to the other three enhancement factors and did not find that any mitigating factors were applicable. The trial court found that probation was inappropriate because measures less restrictive than confinement had previously proved to be unsuccessful and sentenced Defendant to six years in the Tennessee Department of Correction.

When a defendant challenges the length or the manner of service of his or her sentence, this Court must conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). This presumption, however, is contingent upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). If the record fails to show such consideration, the review of the sentence is purely *de novo*. *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determinations the trial court must consider: (1) the evidence presented at the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any appropriate enhancement and mitigating factors; (6) the defendant's potential or lack of potential for rehabilitation or treatment; and (7) any statements made by Defendant in his own behalf. Tenn. Code Ann. §§ 40-35-103 and -210; *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995). If the trial court has imposed a lawful sentence by following the statutory

sentencing procedure, given due consideration and proper weight to the factors and sentencing principles, and made findings of fact adequately supported by the record, this Court may not modify the sentence even if it would have preferred a different result. *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing that his sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The weight placed on one factor by the trial court may vary from that assigned to another, and the legislature has specifically declined to assign a numerical value to mitigating and enhancement factors. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; *State v. Spratt*, 31 S.W.3d 587, 606 (Tenn. 2000). The weight accorded enhancement and mitigating factors is within the trial court's discretion so long as the record supports its findings and the findings comply with sentencing principles. *State v. Kelly*, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000).

Defendant was convicted of aggravated assault, a Class C felony. As a Range I, standard offender, the sentencing range for a Class C felony is not less than three years nor more than six years. Tenn. Code Ann. § 40-35-112(a)(3). The presumptive sentence for a Class C felony is the minimum sentence in the range if there are no enhancement or mitigating factors. *Id*. § 40-35-210(c). Should there be enhancement but no mitigating factors, the trial court may set the sentence above the minimum but still within the range. *Id.* -210(d). If both enhancing and mitigating factors are present, the trial court must start at the minimum sentence of the range, enhance the sentence within the range as appropriate for the enhancing factors, and then reduce the sentence as appropriate for the mitigating factors. *Id*. § -210(e).

Defendant argues that the trial court erred in applying enhancement factors (2), (9) and (14) because the trial court's findings are based on the same facts. At the most, Defendant argues that the three factors should be merged so that one enhancement factor is applied, but he does not suggest which factor should survive. Certainly, Defendant has a long history of criminal convictions and behavior in addition to those necessary to establish the appropriate range. *Id.* § 40-35-114(2). Since turning eighteen in 1989, Defendant has amassed thirty-three convictions including two convictions for possession of marijuana, one assault conviction, one vehicular assault conviction, one attempted burglary conviction, one theft conviction, three misdemeanor reckless endangerment convictions and one felony reckless endangerment conviction. The trial court properly applied enhancement factor (2).

Regardless of the extent of the defendant's criminal history, however, a defendant's sentence may also be enhanced if there is evidence that the defendant has previously been unsuccessful in complying with the conditions of probation. *Id.* 40-35-114(9). Factor (14) may be applied if the defendant commits the offense for which he is being sentenced while on probation. *Id.* 40-35-114(9).

Defendant admitted that he committed the current offense while he was on probation for a prior felony conviction for reckless endangerment with a deadly weapon in Polk County.

Consideration of factor (14) in determining the length of Defendant's sentence was therefore appropriate.

We agree with Defendant's argument that the trial court may not use the current offense to support application of factor (9) because factor (9) applies when there is a *previous* history of unwillingness to comply with the conditions of probation. *State v. Hayes*, 899 S.W.2d 175, 186 (Tenn. Crim. App. 1995). Although it appears as Defendant argues that the trial court relied primarily on the revocation of his probation for his felony reckless endangerment conviction to support application of factor (9), the trial court also observed that Defendant had failed to successfully complete his probation for his misdemeanor convictions also. Defendant, for example, was placed on probation for a period of three hundred and sixty-four days on December 10, 1991 as a result of a misdemeanor theft conviction. On January 22, 1992, Defendant was arrested for evading arrest and reckless endangerment. In addition, Defendant was arrested for driving while intoxicated on March 28, 1992, driving with a suspended license on May 15, 1992, and simple possession of marijuana on May 15, 1992. As part of his sentence arising out of the April 3, 1992 DUI conviction, Defendant was ordered to attend the CADAS alcohol and drug treatment program but failed to do so. Defendant admitted that he did not attend the program although he testified that he attended a "DUI school." Based upon our review, we find that the trial court did not err in applying factor (9) in determining the length of Defendant's sentence.

Defendant also argues that the trial court erred in not considering any mitigation factors but does not suggest which factors he believes the trial court should have applied. At the sentencing hearing, Defendant argued that the following factors should be considered in mitigation of the length of his sentence: factor (2), Defendant acted under strong provocation; factor (3), substantial grounds existed which tended to justify or excuse Defendant's conduct; factor (11), Defendant committed the offense under such unusual conditions that it is unlikely that a sustained intent to violate the law motivated his conduct; and factor (12), Defendant acted under duress. The trial court declined to apply these mitigating factors because it found that the evidence showed that Defendant recognized the victim, gave chase, and set up the sequence of events culminating in the victim's death. The evidence does not preponderate against the trial court's finding. Defendant is not entitled to relief on this issue.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE

-8-