IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 3, 2008

## STATE OF TENNESSEE v. WILLIAM THOMAS BRYANT

**Appeal from the Circuit Court for Obion County**
**Nos. C06-422, 5-135     William B. Acree, Jr., Judge**

---

### No. W2007-01340-CCA-R3-CD  - Filed January 9, 2009

---

The defendant, William Thomas Bryant, was convicted by a jury in the Circuit Court for Obion County of three counts of rape of a child. See T.C.A. § 39-13-522 (2003) (amended 2005, 2006, 2007). He was sentenced to three concurrent fifteen-year sentences of confinement. In this delayed appeal, he claims (1) the evidence was insufficient as a matter of law to convict him of rape of a child, (2) the court erred in admitting the testimony of two nurses as hearsay exceptions, and (3) the court erred in finding the two child victims competent to testify. We affirm the convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Joseph P. Atnip, District Public Defender (on appeal); Noel H. Riley, II and Carla Christian, Dyersburg, Tennessee (at trial), for the appellant, William Thomas Bryant.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon and Heard B. Critchlow, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

At the trial, Obion County Sheriff's Department Investigator John Davis testified that he was contacted in early January 2005 regarding the defendant. Mr. Davis stated that the defendant was living in Obion County at Thanksgiving 2004, the time of the events giving rise to the instant convictions. He stated the dates of birth of the two victims, J.B. and B.R., and said that at Thanksgiving 2004, the victims would have been five and six years old respectively.

Elizabeth Thomas testified that she was a registered nurse with several nursing degrees, including a master's degree. She said she was certified in psychological, mental health, and public health nursing. She also said she had a master's certification in medical and legal death

investigation. She stated she was a professor in the nursing program at the University of Memphis. She said she had worked as a sexual assault nurse examiner at the Memphis Sexual Assault Resource Center for thirteen years. As an examiner, she was the first medical personnel that a patient would see at the center. She said that she would talk to a patient to determine the patient's medical history before taking samples for lab work and that she would then examine the patient.

Ms. Thomas testified that she examined B.R. on January 11, 2005. She said that she spoke with B.R. about her medical history and that B.R. gave her a urine sample to screen for sexually transmitted diseases. She said she conducted an examination of B.R.'s oral, genital, and rectal areas. Although there were no "findings" in either the oral or rectal areas, she said she saw one very significant finding in the genital area. In a child of B.R.'s age, the hymenal tissue should be at least two millimeters thick. She said B.R. was missing hymenal tissue that, if viewed as a clock, corresponded to the positions "5 o'clock to 11 o'clock." She stated that this lack of tissue indicated B.R. had experienced a "blunt penetrating trauma." She determined that the injury was old and that her finding would be consistent with an injury date around Thanksgiving of the previous year. She said that if the wound had been more recently inflicted, the tissue would have been bleeding, bruised, or inflamed. She said B.R.'s injury had already healed, precluding her from dating it more specifically.

Ms. Thomas testified that B.R. told her the source of her injury. Although B.R. said she was not currently in pain, she did point her finger to her genital area when the nurse asked her if she had hurt in the past. Ms. Thomas said that when she asked B.R. why that area hurt, B.R. said, "It hurt every time he stuck his finger in." The nurse said she asked B.R. if that event had occurred one time and that B.R. replied, "No, it happens every time I go over there and sleep." She said she asked the patient if she could elaborate. Ms. Thomas said that B.R. explained that every time she visited the defendant's house, she was told to sleep naked, and that a finger was inserted into her which hurt. She said that B.R. identified her step-uncle, the defendant, as the perpetrator.

On cross-examination, Ms. Thomas testified that she did not diagnose B.R. with anything during the examination because she did not have the results of the urinalysis at that time. She explained that she did not swab for a semen sample because B.R. was not an emergency client but instead was referred as a child abuse evaluation with "no report of any contact." She said that swabbing was not part of the protocol for that type of patient. Ms. Thomas said she did not treat B.R. for any ailment because she was an appointment patient and not an emergency case. While she stated that a blunt trauma finding could be caused by several things, she ruled out a straddle-type injury as the cause of B.R.'s lack of tissue because a straddle injury would not penetrate the hymenal tissue. She stated that viewing the opening as a clock, B.R. had some tissue "from 12 to 4" but that she had a "notch in her tissue from 4 to 5." She said that the healed injury could have occurred weeks or even months before the January appointment date.

Sally DiScenza testified that she examined J.B. She stated she was a family nurse practitioner and a nurse examiner at the Memphis Sexual Assault Resource Center. She said she obtained a master's degree in nursing, was nationally certified as a family nurse practitioner, and completed the internship program at the center. She said she had worked at the center for eleven and one-half years.

Ms. DiScenza testified that J.B. came to the center for an "assessment for sexual assault." She said that she spoke with both J.B. and her mother separately to gather J.B.'s medical history and that she subsequently examined J.B. and found abnormalities in the vaginal and anal areas. These abnormalities showed "some type of penetrative injury" to the hymenal tissue and anal areas. She stated that for a five-year-old, any wearing away of hymenal tissue indicates penetrative injury. She said that J.B. had a notch in her hymenal tissue at "4 o'clock" and that the tissue from "4 o'clock" to "11 o'clock" had been worn away. She said that J.B. also had an enlarged hymen diameter of fifteen millimeters. Ms. DiScenza stated that although the size can vary with the stature of the child, she would have expected a six- or seven-millimeter range for a child of J.B.'s age. She stated that she saw two fissures in J.B.'s anal area, a sign of damaged tissue that has healed. She said that J.B. had a dilated anus and that this was a reflexive response to penetrative injury. Furthermore, J.B. had anal "scalloping," which is indicative of healed tissue at the "border of the anal opening."

Ms. DiScenza testified that there was no way to tell what caused the penetrating injuries. She said she could not tell how old the trauma was even though J.B. had a general redness in her vaginal area, but she said these types of injuries were consistent with penetration occurring at the time of Thanksgiving 2004. She stated that problems other than recent injury, such as poor hygiene and infection, could cause this redness. She said she documented this general redness along with the patient's history of dysuria (painful urination) and recommended subsequent follow-up regarding the urinalysis results. She said that she also screened for sexually transmitted diseases.

Ms. DiScenza testified that when she was talking to J.B. about her medical history, J.B. told her how she had been injured. She stated that J.B. told her that her uncle, the defendant, had touched her vaginal area and buttocks with his hands, once in the front and twice in the back. She said that J.B. told her that her uncle had been naked at the time. She said J.B. responded to her questioning whether her uncle had touched her with his genitals by saying "Yes" and pointing to her front and back sides to indicate where he had touched her. Ms. DiScenza also said that this kind of contact was consistent with her physical findings.

On cross-examination, Ms. DiScenza restated that she found redness and fissures in J.B.'s anal canal and redness in her perihymenal area. In response to defense questioning whether redness indicated recent injury, she repeated that many things could cause redness and that she was unable to identify the cause. She stated that she did not collect any DNA evidence from J.B. because it was not protocol to take such evidence if an assault had occurred more than seventy-two hours before the examination. She stated that the assault giving rise to these proceedings occurred before December 25, as this was the last time the patient "had contact with a perpetrator or someone that is disclosed to have assaulted someone" as stated in her medical history. She said if she had suspected DNA were present, she would have taken a kit. She said that she did not think the redness was indicative of recent injury and that she did not swab for DNA for this reason. She stated that it was always possible that there had been DNA evidence. She also said she did not have J.B.'s clothing tested for DNA evidence.

Ms. DiScenza testified that a straddling injury would not penetrate hymenal tissue. She said it was unlikely that a child could inflict that type of injury herself. She stated she recommended J.B. for follow-up because the center had to send the sample to a laboratory to determine whether J.B.

-3-

had any infections that would explain the general redness she had observed. She said the urine screens for chlamydia and gonorrhea were negative. She said that it was possible that the injuries to the hymenal tissue were caused by penile penetration and that such penetration would not completely remove all the hymenal tissue. She stated that J.B. still had hymenal tissue from "12 [o'clock] to 4 [o'clock]," where the notch was.

She stated the results of the STD screens. She stated that she referred J.B. for a follow-up visit because of her redness. She said that she did not diagnose "sexual assault" because that was a legal, and not medical, term.

Cheryl Robinson testified that she was B.R.'s mother and the cousin of J.B., who was her aunt's daughter. She said she knew the defendant because he was this aunt's ex-husband. She stated her daughter, B.R., stayed with the defendant at least one weekend a month and that J.B. often stayed with the defendant at the same time. She said that her daughter went to the defendant's home on November 23, 2004. She said he had called to ask if B.R. could visit, as J.B. was going to be there. Ms. Robinson said that he had called on other occasions to have B.R. visit him and that she did not consider this an odd request. She stated that B.R. and J.B. were at the defendant's home on Tuesday, Wednesday, and Thursday nights. She said the defendant brought the children home on Friday. She said that since she learned of the defendant's actions, she had not permitted her daughter to go back to the defendant's home.

On cross-examination, Ms. Robinson testified that she had known the defendant since she was a child and that she was then thirty years old. She said she had never called the defendant to ask him to come get her daughter. Instead, she said it was the defendant who always asked to come get B.R. She stated that other children visited the defendant, as well. Ms. Robinson said she spoke with her daughter on the telephone almost daily when B.R. was at the defendant's home over Thanksgiving. She denied that a government agency had removed B.R. from Ms. Robinson's home and that B.R. had been sexually assaulted by a neighbor.

Vivian Grooms testified that she worked for the Women's Resource and Rape Assistance Program. She said she was a therapist and the sexual assault coordinator for the program. She said she had been giving the two victims therapy since January 2005. She said they were making progress and that she met with them monthly. She said the therapy goal for the girls was to return them to "more normal behavior."

J.B. testified that she was six years old. She used girl and boy dolls in her testimony to show where "private parts" were and the record reflects that she pointed to the genitals and buttocks. When asked whether anyone had touched her "private parts," she said that her uncle had touched her in his bedroom in Union City when both she and B.R. were in the bedroom. Using the dolls, she indicated that her uncle had pulled down his pants and inserted his penis into her anus. She said she had not been wearing clothes at the time. She said she saw her uncle penetrate B.R. anally with his penis.

On cross-examination, J.B. testified that she had been living with a woman she called both her "auntee" and "foster mother." She also said that a man named "Tim" lived with them. She

admitted that she no longer lived with them and that she had been removed from their household because she had been permitted to visit her uncle. She remembered visiting her uncle for Thanksgiving in 2004, but she did not remember how many nights she had been there. She said she was there with B.R., Akasha Lovell, and another child. She said that she did not remember what she and they had been doing but that Tarneka Jackson had taken her upstairs to bathe her along with the other children. She said that the other child and Akasha slept in the other bedroom and that she and another child slept in her uncle's bed with Tarneka. She said it was dark. She stated that she remembered telling an investigator that nothing had occurred that night. She also remembered telling the investigator that her uncle had not done anything to B.R. She said she liked her uncle. She said she was not scared when she went back to her uncle's house after Thanksgiving. She admitted that she said during the voir dire that she had once lied daily.

B.R. testified that she was eight years old. She pointed to the vaginal and chest areas of a girl doll to indicate where "private parts" were. She said that her uncle had touched her private parts while she was at his house. She said she and her cousin J.B. had been watching television in his bed. She said that her uncle was in the middle of the bed and that J.B. was on his other side. She used the dolls to show that her uncle had placed his hands on her genitals. She said that she was wearing pajamas at the time and that her uncle reached underneath them to touch her. She said she saw her uncle touching J.B., and she demonstrated, using the dolls, that her uncle touched J.B.'s genitals. She stated that no one other than her uncle had touched her in this way and that she had not been back to her uncle's house since this incident.

On cross-examination, B.R. testified that she did not remember telling an investigator that she "lied all the time." She said her uncle would take both her and J.B. to movies, skating, and Chuck E. Cheese. She said she arrived at her uncle's home the day before Thanksgiving. She said Tarneka was with her uncle when he picked her up. She stated that Tarneka and the other two girls did not get into bed with her, J.B., and the defendant. She said she could see in the bedroom because light was coming from the television. She acknowledged that she had said the defendant had rubbed their "front [private] parts."

Tarneka Jackson, the defendant's niece, was the defense's first witness. She testified that she lived with her father and step-mother. She said she had known the defendant for six months, which was the amount of time she had been living in Dyer. She also had known the two victims for six months. She said the defendant picked her up the day before Thanksgiving and that they picked up the two victims. She said that she, the defendant, her cousin Akasha, Akasha's children, and the two victims went grocery shopping for their holiday meal. She said that after they arrived at the defendant's house, she watched the children while the defendant and Akasha prepared the Thanksgiving meal. She described the defendant's apartment as having two upstairs bedrooms and a first floor with a living room, kitchen, and bathroom. She said that she and the children were downstairs and that she took them upstairs to bathe them and put them to bed in the guest bedroom. When she went to bed later, she slept in that bed with the four children. She said that Akasha came upstairs later that night but that the defendant did not. She said he slept on the couch downstairs. She said she fed the children on Thanksgiving after they woke up. She said that while bathing them that day, J.B. said her "privacy" was hurting. In response to her questioning, J.B. had said that she

and her father had "rough played." She said that she and the girls went home after eating their Thanksgiving meal.

On cross-examination, Ms. Jackson said that she and the victims arrived at the defendant's house the day before Thanksgiving. She admitted that she had told an investigator that she had arrived at the defendant's house the previous Friday and stayed until Tuesday before returning for Thanksgiving. She admitted that she had made that statement only a few months after Thanksgiving. She stated that her trial statement was the correct one. She said that her uncle took her with him for his National Guard trips and that she and her uncle would share a room on these trips. She also said that she and the victims spent Thanksgiving night at the defendant's home and that she went with them on Friday when they left.

Akasha Lovell, the defendant's daughter and mother of the defendant's three grandchildren, testified that her father and Tarneka had picked up the victims the night before Thanksgiving. She drove to his house in her car with her children. She said she was Tarneka's cousin. She said that she, her father, and the children went grocery shopping and that she and her father prepared the meal at his house. She stated that Tarneka was babysitting the children and prepared them for bed. She said that she and her father had allowed Tarneka to stay up with them. She said that everyone except herself and her father slept in the other bedroom upstairs, where there was a nightlight. She stated that she checked on the children at one point, that she was up all night cooking, and that her father slept downstairs on the couch. She said that B.R. was upset the following morning because the meal was not yet ready.

On cross-examination, Ms. Lovell said that she did not remember who drove her to her father's house the day before Thanksgiving. She also claimed that she and the two victims left the defendant's house on Thanksgiving Day after the meal.

Laura Spears testified that she and her two sons were at the defendant's house for Thanksgiving. She said that the two victims left Thanksgiving night. She said that Ms. Lovell took her children and J.B. home and that she, her sons, the defendant, and Tarneka Jackson drove B.R. home. She said the two victims neither acted unusually nor complained about anything that day.

On cross-examination, Ms. Spears acknowledged that she initially told Investigator Davis in 2005 that the defendant had been walking around shirtless in his boxer shorts when she arrived, but that her present recollection was that the defendant had been wearing shorts and not just underwear. She told Investigator Davis that Tarneka had slept with the two victims. She stated at trial that the others had told her about their sleeping arrangements but that she had no first-hand knowledge of the arrangements because she had not been there.

The defendant testified that he was forty-seven years old and that he had two daughters and three grandchildren. He said he was in the National Guard and participated in military funeral honors. He said that he and his daughter, Akasha, organized their Thanksgiving celebration. He said he picked up Tarneka and the two victims. He said his daughter Akasha drove to his house with her children because his car would not accommodate so many passengers. He said they went grocery shopping. He said that Tarneka babysat the younger children and prepared them for bed while he

and Akasha prepared the next day's meal. He said the children slept upstairs in the two bedrooms. He said he did not go upstairs the entire night, as he had a bathroom downstairs and had moved what he needed for the night downstairs before the arrival of his family. He stated he never molested either victim. He stated that although he was aware J.B. had been acting unusually due to another incident, she did not do so while at this house for Thanksgiving. He said that B.R. had not acted unusually. He said it was normal for his family to come to his house and to spend the night. He said everyone went home after the Thanksgiving meal. He said that the children had returned to his house after the alleged incident and that no one had ever mentioned anything about the allegations to him.

On cross-examination, the defendant said he had heard the victims' testimony and could not explain what they had to gain by fabricating charges against him. He stated that J.B. had been molested by someone else, that she had told Tarneka Jackson about her symptoms at bath time, and that when Ms. Jackson informed the defendant, he called the child's mother to inquire.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims the evidence was insufficient to convince a reasonable jury of the defendant's guilt beyond a reasonable doubt. He argues that inconsistencies in the witnesses' testimony preclude a finding of guilt.

The State argues that the defendant has waived this issue by not citing any legal authority. Additionally, the State claims that the defendant has not met his burden of showing why the evidence is insufficient to support the verdict pursuant to State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003). The State contends the evidence presented at trial showed that the defendant had digitally penetrated two children when the children were five and six years old respectively. The defendant in his reply brief provides citations to Tennessee Rule of Appellate Procedure 13(e) and State v. Cabbage, 571 S.W.2d 832 (Tenn. 1978), to show that he has not waived the issue, and we will decide the issue on the merits.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

We agree with the State that the evidence is sufficient to convict the defendant of three counts of rape of a child. The offense consists of showing beyond a reasonable doubt that (1) the defendant unlawfully sexually penetrated the victim, (2) who was less than thirteen years old, and that (3) the defendant acted intentionally, knowingly, or recklessly. T.C.A. § 39-13-522 (2003) (amended 2005, 2006, 2007). In the cases at bar, the evidence showed that at Thanksgiving 2004, the two child victims were ages five and six. The evidence showed that the defendant penetrated J.B.'s vagina and anus and B.R.'s anus. The fact finder accredited the testimony of the two children

and the nurses. The children testified that their uncle, the defendant, had touched and penetrated them. The nurses testified that the children's injuries were caused by penetration and that the healed tissue was consistent with injuries occurring at Thanksgiving 2004. We note that the jury found the defendant not guilty on two counts and that three of the counts were dismissed during the trial. The defendant has not met his appellate burden of showing how the evidence is insufficient to support the verdict. The defendant's argument on appeal essentially asks this court to weigh the credibility of the two victims and the other witnesses, which we cannot do. See State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003) (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn.1997)). We hold that there was sufficient evidence to convict the defendant of three counts of rape of a child.

## II. ADMISSION OF THE NURSES' STATEMENTS

After the voir dire of both nurses outside the presence of the jury, the court ruled that the testimony identifying the perpetrator might be relevant for both diagnosis and treatment. The court found that the evidence supported the State's claim that the victims went to this specific facility for diagnosis and treatment. The witnesses testified that the identification of the abuser was important for two reasons: (1) to report the presence of sexually transmitted disease, if present, to the Department of Health for it to be "traced and treated," and (2) to prevent recurring harm to the victim if the abuser were a member of the household. The court also stated that it would admit this evidence because the State said it would introduce evidence that the victims had been in the defendant's home on other occasions.

The defendant claims that the court erred in admitting the testimony of two sexual assault center nurses recounting the victims' statements because the nurses' testimony was not a hearsay exception under Tennessee Rule of Evidence 803(4). Citing State v. McLeod, 937 S.W.2d 867, 873 (Tenn. 1996), the defendant claims their testimony was inadmissible as the children's statements were not made for both diagnosis and treatment, but instead were merely for "evaluation" of possible sexual assault that the center would forward to the patient's primary care physician.

The State responds that the court did not abuse its discretion when admitting the testimony because the facts of the case indicate that the statements were made for diagnosis and treatment. State v. Stinnett, 958 S.W.2d 329 (Tenn. 1997). It asserts the court looked to the circumstances surrounding the statement of the child declarant as required by McLeod to determine whether the statement was made for diagnosis and treatment and used State v. Livingston, 907 S.W.2d 392, 397 (Tenn. 1995), to support its decision to admit the identification testimony of the minor declarants.

The Tennessee Rules of Evidence allow the admission of certain hearsay exceptions, including statements made for diagnosis and treatment. Tenn. R. Evid. 803(4). Our supreme court stated in Stinnett that this type of statement is reliable for two reasons: (1) "a statement made by a patient to a [medical provider] is presumptively trustworthy because a patient is strongly motivated to speak the truth in order to receive proper diagnosis and treatment" and (2) "any statement upon which a [medical provider] will rely as a basis for diagnosis and treatment is also sufficiently reliable for consideration by a court of law." Stinnett, 958 S.W.2d at 331 (citations omitted). The court also found that if a statement is made for diagnosis and treatment and the statement "regard[s] the general character, cause, or source of the problem," this statement is admissible if it is "reasonably pertinent

-8-

to diagnosis and treatment." Id. (citing McLeod, 937 S.W.2d at 870). In determining whether a child declarant made a statement for diagnosis and treatment that would be admissible as a hearsay exception, the trial court must consider the "circumstances surrounding the making of the statement," including whether a custody battle is pending and whether the child's statement followed suggestive or leading questioning. McLeod, 937 S.W.2d at 871.

The children at the time of their examinations were five and six years old. The nurses' testimony reflected that the children stated how they were injured and who injured them in order to be examined by the nurses. The nurses used this information to determine their treatment response. The nurses testified that after hearing the victims' medical histories, they took urine samples from the victims to test for sexually transmitted infections. The testing was not gratuitous. The nurses ordered the testing to determine if the victims had any infections resulting from the penetration. If these samples had revealed any infection, the nurses would have treated the victims. Ms. DiScenza stated that she recommended that J.B. follow up to treat her general redness, which the nurse suspected was symptomatic of a urinary tract infection, as J.B. had told her that urinating caused pain. The tests were negative. As noted in State v. Spratt, 31 S.W.3d 587, 600-01 (Tenn. Crim. App. 2000), the fact that actual treatment was not necessary is irrelevant to the inquiry.

Additionally, the victims in the instant case differ significantly from the second victim of State v. McLeod, 937 S.W.2d 867 (Tenn. 1996), where our supreme court found similar statements were inadmissible hearsay. In McLeod, our supreme court found that a second victim's statements were not made for diagnosis and treatment. This particular person told her medical provider that she had been fondled. Her examiner testified that she had examined the patient but that she had not expected to find signs of abuse. The supreme court found that "[t]he nature of the abuse made it unlikely that a physical examination would uncover trauma or other evidence of sexual abuse." 937 S.W.2d at 873. Thus, the statement had not been made for purposes of diagnosis and treatment and was inadmissible hearsay.

Unlike the second victim in McLeod, the children in the present case stated that they had been penetrated vaginally and anally. The nurses conducted the subsequent examinations to check for physical signs of this abuse. The nurses used these statements to diagnose and to treat the children, if necessary, for any conditions resulting from penetration, and they noted their findings of healed tissue and missing tissue. At trial, they stated that their findings were consistent with the events their patients recounted.

The trial testimony also does not indicate any custody or familial dispute that our supreme court stated could "affect trustworthiness" of the statement. McLeod, 937 S.W.2d at 871. Also, the trial transcript does not reveal suggestive questioning of the victims. We conclude the trial court properly admitted the testimony of the nurses after determining that the statements were made for the purposes of diagnosis and treatment.

### III. COMPETENCE OF THE CHILDREN TO TESTIFY

During voir dire, although J.B. initially agreed that she had once lied daily, she stated that her mother had sent her to a corner when she lied. She also said that she knew what it meant to make

a promise. She said that if someone made and then broke a promise, then "people [would be] sad." She stated that she understood "oath" meant she was promising to tell the truth and that she would tell the truth while testifying. She also claimed she had told the truth to investigators. The trial court found that the State had demonstrated that J.B. understood the necessity of telling the truth and the consequences for not telling the truth.

B.R. said during the voir dire that she knew the difference between the truth and a lie. She correctly answered true-or-false questions about the colors of clothing and hair of people in the courtroom. She said she could promise to tell the truth and that this would mean she could be trusted. She said that it was bad to break promises. During cross-examination, however, she did not remember telling an investigator that she lied "all the time." She said she understood that she could be punished if she did not tell the truth on the witness stand. The court held that she was competent to testify.

The defendant contends that the trial court erred in determining that the two young victims were competent to testify. He cites State v. Ballard, 855 S.W.2d 557 (Tenn. 1993), to question the children's ability to distinguish between the truth and a lie. He relies on a reproduced section of the voir dire without further analysis.

The State responds that the defendant has waived this issue pursuant to Rule 10(b) of the Rules of the Court of Criminal Appeals by failing to support the issue with argument, citing one case, and reproducing a section of the voir dire without analysis. Alternatively, the State argues that the defendant failed to demonstrate that the trial court abused its discretion by determining that the children were competent to testify pursuant to Ballard. The defendant in his reply brief refutes the State's claim of waiver, and we will decide the issue on its merits.

Under Tennessee law, "[e]very person is presumed competent to be a witness except as otherwise provided." Tenn. R. Evid. 601. "Before testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so." Tenn R. Evid. 603. "The question of whether a child-victim is competent to testify . . . rests within the sound discretion of the trial court." State v. Griffis, 964 S.W.2d 577, 592 (Tenn. Crim. App. 1997) (citing State v. Hallock, 875 S.W.2d 285, 293 (Tenn. Crim. App. 1993)). "The pivotal issue in the court's determination is the child-victim's ability to understand the necessity of telling the truth while testifying during the course of the trial." Griffis, 964 S.W.2d at 592 (citing State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993)). We will not overturn the trial court's competence determination absent the abuse of discretion. Hallock, 875 S.W.2d at 293.

In the instant case, the trial court found that the State had demonstrated that each of the two children understood the necessity of telling the truth and the consequences for not telling the truth. Before each of the child witnesses testified, the court heard the child's responses to questions from counsel. Each witness said that when she had lied in the past, she had been punished for not telling the truth. In each hearing, the State demonstrated that the young witness understood what a promise was, and each witness promised to tell the truth while testifying. We conclude the trial court did not abuse its discretion when the court found the child victims were competent to testify.

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE